## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 12** |
| | : | |
| **RENEE M. THORPE,** | : | |
| | : | |
| Debtor | : | **Bky. No. 13-15267 ELF** |

# M E M O R A N D U M

## I.  INTRODUCTION

Joseph G. Mirarchi Legal Services, P.C., a law firm in which Joseph G. Mirarchi ("Mr. Mirarchi")  is the sole practitioner,[1] has filed a motion ("the Mirarchi Motion") seeking payment of $113,400.00 that has been placed in the bankruptcy court clerk's registry.  The $113,400.00 constitutes thirty-five percent (35%) of the settlement proceeds of a lawsuit the chapter 12 debtor, Renee M. Thorpe ("the Debtor"), and her non-debtor husband, Dale Thorpe ("Mr. Thorpe"), filed against Nationwide Mutual Insurance Company ("Nationwide").

 Mirarchi seeks the $113,400.00 fund based on a contingent fee legal services agreement entered into during the pendency of this chapter 12 bankruptcy case.  The Debtor and Mr. Thorpe (collectively, "the Thorpes") object to the payment of any professional compensation to Mirarchi. The chapter 12 trustee ("the Trustee") also objects to the payment requested by Mirarchi.

As explained below, I have concluded that this is a non-core matter as to which the bankruptcy court lacks authority to enter a final judgment.  See 28 U.S.C. §157(c)(1).  Mirarchi has not consented to the entry of a final order by the bankruptcy court.  Accordingly, this Memorandum will serve as my proposed findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 9033.

---

[1]      In this Memorandum, I will refer to Mirarchi and Mr. Mirarchi interchangeably.

Based on the proposed findings of fact and conclusions of law, I recommend that the district court enter an order denying the Mirarchi Motion in its entirety.

## II.  PROCEDURAL HISTORY

### A.  The Two (2) Confirmed Chapter 12 Plans

The procedural history of this case was set out in great detail in the district court's reported opinion, In re Thorpe, 540 B.R. 552 (E.D. Pa. 2015).  I will truncate that history to highlight the events most relevant to the current matter.

On June 13, 2013, the Debtor filed a chapter 12 bankruptcy petition in this court.  The bankruptcy filing stayed a sheriff's sale of the Debtor's farm property, 371 Stoney Brook Road, Newtown, PA ("the Farm") scheduled by Lititz Properties, Inc. ("Lititz").  At that time, Lititz held a mortgage on the Farm, as well as a mortgage on a second (residential) property owned by the Thorpes.

On January 13, 2014, this court confirmed the Debtor's Fourth Amended Plan ("the Initial Confirmed Plan"). The Initial Confirmed Plan provided for the modification and payment of Lititz's allowed secured claim.  See 11 U.S.C. §§1222(b)(2), 1225(a)(5).  To implement the Initial Confirmed Plan, the Debtor was obliged to sell one (1) parcel of the Farm, the proceeds of which would be applied to reduce the balance of Lititz's allowed secured claim.  After that sale, the Initial Confirmed Plan contemplated that the Debtor would retain the balance of the property that comprised the Farm and satisfy the balance of Lititz's claim through periodic payments.  It further provided that if the Debtor was unable to sell the parcel by a set deadline, the Trustee was authorized to market the parcel.

### B.  The Fifth Amended Plan and the Auction of the Farm Property

Ultimately, neither the Debtor nor the Trustee succeeded in selling the Farm parcel by the deadline set in the Initial Confirmed Plan.  As a result, Lititz pressed for dismissal of the bankruptcy case.

After extensive negotiations among the parties and with their consent, on November 13, 2014, the court approved a post-confirmation modified plan, the Debtor's Fifth Amended Plan, as Amended ("the Modified Confirmed Plan").  Under the Modified Confirmed Plan, the Debtor was given a short period to market the parcel and, if no buyer were found, the Trustee would market the parcel for a fixed period of time.  If the Trustee could not sell the parcel within the allotted time, an auction of the entire Farm would be held.  Lititz retained the right to credit bid at the auction. The auction process was subject to the continuing right of the Debtor to pay Lititz a fixed sum ($1 million), which the Debtor could obtain by finding a buyer for the parcel or by any other means.  If the Debtor made the $1 million payment, no auction would be held and the Debtor would be entitled to satisfy the balance of Lititz's allowed secured claim through periodic payments as set forth in the Modified Confirmed Plan.

Again, neither the Trustee nor the Debtor was able to sell the parcel.  Nor was the Debtor able to raise the $1 million necessary to forestall the auction.  As a result, the entire Farm was sold to a third party at an auction held on September 16, 2015.  Prior to the auction, Lititz's proof of claim, to which the Debtor had filed an objection, was temporarily allowed for purposes of credit bidding in the amount of $2,358,354.32.  (Doc. # 463).

At the auction, Lititz did not invoke its credit bid to make the highest bid.  Instead, the winning bid, made by a third party, was $1.75 million.

This court confirmed the auction sale by order dated September 18, 2015.  (Doc. # 476).

The Debtor appealed the order confirming the sale.  The district court affirmed the order by opinion and order dated October 9, 2015.  See Thorpe, 540 B.R. at 565-68.  On October 16, 2015, the Trustee closed with the buyer and transferred the Farm to him.  (See Trustee's Report ¶ 7) (Doc. # 495).[2]

## C.  The Mediation

The Farm having been auctioned, this court held a status hearing in the case on November 24, 2015.

At the status hearing, the Debtor and Lititz discussed certain issues that remained unresolved.  Lititz's claim was secured not only by the Farm, but also by the Debtor's second (residential) property.  With the loss of the Farm, the Debtor expressed her intent to move with her family into that second property in the near future.  From Lititz's perspective, the auction price for the Farm ($1.75 million) was significantly less than the outstanding debt (in excess of $2.3 million), leaving Lititz with a substantial deficiency claim, secured by that second property. The Debtor asserted that her then-pending objection to Lititz's claim would either eliminate or greatly reduce Lititz's deficiency claim, allowing her to propose a second, post-confirmation modified plan.  Lititz disputed the validity of the Debtor's claim objection and did not concede that the Debtor had any further right to modify her chapter 12 plan.

Rather than resume litigation of the claim objection and commence litigation regarding

---

[2]     The Debtor appealed the district court's October 9, 2015 order to the Third Circuit Court of Appeals, but did not obtain a stay.  The appeal to the Third Circuit was dismissed on December 21, 2015.

the merits of another post-confirmation modification to the Debtor's plan, the Thorpes and Lititz

agreed to mediation.  Following the status hearing on November 24, 2015, Judge Ashely M.

Chan of this court agreed to serve as mediator and was so appointed.

Judge Chan successfully mediated the disputes between the Thorpes and Lititz.

However, the mediation also brought to light the dispute that is now before the court.

### D.  The Mediated Lititz Settlement and the Mirarchi Dispute

At the same time as the unsuccessful marketing process of the Farm parcel that eventually

led to the auction of the Farm was taking place in September 2015, the Debtor was pressing an

insurance claim against Nationwide in state court.  The insurance claim was based on several fire

and storm events that damaged the Farm and its structures.

Three (3) salient events occurred in connection with this insurance litigation:

(1)   Nationwide offered to settle the matter for approximately $324,000.00;

(2)   The Thorpes retained Mr. Mirarchi under a 35%  contingency fee agreement
        and later terminated him as their counsel; and

(3)   The Thorpes discharged Mr. Mirarchi as counsel before any settlement was
        reached and disputed his entitlement to any counsel fee.

The Nationwide insurance matter figured prominently in the mediated settlement ("the

Lititz Settlement") between the Debtor and Lititz, as the availability of the settlement proceeds

was material in inducing Lititz to compromise its claim against the Thorpes.  The question that

came up was whether the full $324,000.00 was available to fund the settlement or whether that

fund would be diminished by the Mirarchi 35% contingent fee.

By the conclusion of the mediation, the Thorpes and Lititz reached an agreement, but no

global settlement was reached that would resolve the Mirarchi fee dispute.  As a result, the

essential terms of the Lititz Settlement were:

- the Debtor and her husband would promptly accept Nationwide's offer to settle the pending action for $324,000.00;

- the Debtor and her husband would pay Lititz $210,600.00, representing the undisputed 65% of the insurance settlement proceeds;

- the dispute regarding the remaining 35% of the proceeds, (i.e., Mirarchi's claimed contingent fee of $113,400.00), would be resolved at a later date;

- to the extent that Mirarchi received less than his 35% contingent fee, Lititz would receive an additional payment, up to a maximum of $9,400.00

- Lititz would accept the payments provided in the Settlement Agreement in full satisfaction of its claim against the Debtor and her husband and release its mortgage against the Debtor's remaining (residential) real property.[3]

On April 19, 2016, Lititz filed a motion to approve the Lititz Settlement ("the Lititz

Settlement Motion").  (Doc. # 547).  Mirarchi, the Trustee and the Thorpes all filed responses to

the Lititz Settlement Motion.  (Doc. #'s 550, 553, 559).

Mirarchi's primary concern was to ensure that approval of the Lititz Settlement would not

prejudice his claim for his contingent fee.  (See Doc. #'s 545, 550).  On behalf of the bankruptcy

estate, the Trustee did not object to the Lititz Settlement "per se," but questioned Mirarchi's

entitlement to the 35% contingent fee.  (Trustee's Response ¶16) (Doc. # 559).  In the Thorpes'

response, which was styled as Motion for Extension of Time, remarkably, they appeared to

dispute that the settlement stipulation attached to the Lititz Settlement Motion (that they signed)

fully and accurately reflected all of the settlement terms.  (Debtor's Motion for Extension of

Time ¶¶8-9) (Doc. # 553).

---

[3]     The Thorpes also granted Lititz a general release of all claims.

By order dated May 25, 2016, the court overruled all of the objections, granted the Lititz

Settlement Motion and approved the Lititz Settlement.  That order authorized the payment of

$210,600.00 to Lititz and, with the consent of all of the parties, directed that the balance of the

settlement proceeds "be paid to and held in escrow by the Clerk of the Bankruptcy Court pending

further determination by a court of competent jurisdiction of the competing claims to the

remaining $113,400.00."  (Doc. # 572).


### E.  The Mirarchi Motion

On June 22, 2016, Mirarchi filed the Mirarchi Motion.  (Doc. # 581).  In the Motion,

Mirarchi requested  that the court enforce its contingent fee agreement and direct the Clerk of the

Bankruptcy Court to pay him the $113,400.00 held by the Clerk (hereafter, "the Disputed

Funds").[4]

The Thorpes filed a lengthy response to the Mirarchi Motion on July 11, 2016, asserting

that due to various types of attorney misconduct, Mirarchi had no entitlement to any fee for

services provided in connection with the Nationwide litigation.  (See Doc. # 586).[5]  The Trustee

objected to the Mirarchi Motion on the ground that all of the insurance proceeds constituted

property of the bankruptcy estate, that no attorney's lien could attach to those proceeds and that

---

[4]     When the Mirarchi Motion was filed, the $113,400.00 had not yet been delivered to the
Clerk.  Subsequently, the Clerk did receive the funds.  (See Undated Docket Entry dated August 19,
2016).

[5]     The Thorpes also requested, without any basis in the rules of court, that the court award
them treble damages and attorney's fees under the Pennsylvania Unfair Trade Practices and Consumer
Protection Law, 73 P.S. §§201-1 et seq.  Any affirmative claim that the Thorpes may have against
Mirarchi is not before the court and I will not address that claim.  See Fed. R. Bankr. P. 7001(1)
(requiring such claims to be asserted in an adversary complaint).

the fee requested was not reasonable.  (Trustee's Objection ¶¶18, 20-21, 23) (Doc. # 590).

The hearing on the Mirarchi Motion was held over three (3) days, August 3, 2016, August 8, 2016 and August 19, 2016.  Mirarchi and the Thorpes filed post-hearing memoranda in support of their positions, the last of which was filed on December 2, 2016.  The Trustee elected to stand on his written objection to the Motion and did not attend the evidentiary hearing or file a post-hearing memorandum.

### III.  PROPOSED FINDINGS OF FACT

Set forth below are my proposed findings of fact.  In making these proposed findings, I have considered the credibility and demeanor of the trial witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.  Where it would provide context, I have set forth in footnotes additional observations and analysis of the evidence presented.

### The Parties

1.    The Debtor and Mr. Thorpe are husband and wife and the owners of the Farm.

2.    Mirarchi is a law firm in which Mr. Mirarchi is president and the sole practitioner.  (8/3/16 N.T. at 10, 87).[6]

3.    Mr. Mirarchi began practicing law in December 2001.  (Id. at 13).

---

[6]    Although Mirarchi is a sole practitioner, another attorney, Gary Silver ("Mr. Silver") has worked with Mirarchi on the Thorpes' lawsuit described below in and has a financial interest in the litigation. (8/3/16 N.T. at 48-49, 87-88). Mr. Mirarchi testified that Mr. Silver's participation in the matter commenced in April or May 2015.  (Id. at 90).  Mr. Silver will receive from Mr. Mirarchi a percentage of any counsel fees Mr. Mirarchi derives from his representation of the Thorpes.

**The State Court Insurance Litigation: Moldovsky's Representation of the Thorpes**

4.    Between 2010 and 2012, the Farm was damaged by two (2) separate storms, as well as by a

fire. (8/8/16 N.T. at 149; 8/19/16 N.T. at 54).

5.    On March 21, 2013, the Thorpes commenced a lawsuit ("the C.P. Action" or "the Insurance

Litigation") against their property insurer ("Nationwide")[7] for benefits they claimed were

due under their insurance policy, by filing a writ of summons in the Court of Common

Pleas, Bucks County ("the C.P. Court"). (Ex. M-2).[8]

6.    When they commenced the C.P. Action, the Thorpes were represented by Brem Moldovsky

("Mr. Moldovsky").  (Id.).

7.    On July 23, 2013, the Debtor filed a motion requesting that the court award $51,025.54 in

compensation to Mr. Moldovsky ("the Moldovsky Fee Motion").  The request was based on

Mr. Moldovsky's negotiation of a partial settlement of the Thorpes' claim in the amount of

$155,270.70 and Mr. Moldovsky's contingent fee agreement with the Thorpes.  (See Doc. #

21).

8.    Lititz filed an objection to the Moldovsky Fee Motion, but later withdrew it.  As a result,

the court granted the uncontested Moldovsky Fee Motion by order dated October 16, 2013.

(See Doc. #'s 41, 71).

9.    At no time did the Debtor seek Mr. Moldovsky's appointment as special counsel.

---

[7]       The docket in the C.P. Action states that there are three defendants: Nationwide Mutual
Insurance Co., Nationwide Agribusiness Insurance Co. and Nationwide Insurance.  In this Memorandum,
I will refer to all three defendants collectively as "Nationwide."

[8]       The C.P. Action was docketed as No. 2013-02071.  (Ex. M-2).

### The State Court Insurance Litigation: McDuffy's Representation of the Thorpes

10. Approximately one (1) year after commencing the C.P. Action, the Thorpes retained new

counsel, Herbert McDuffy, Jr. ("Mr. McDuffy"), who entered his appearance on the

Thorpes' behalf in the C.P. Court on February 14, 2014.  (Ex. M-2).

11. On October 23, 2014, Nationwide filed a Petition for a Rule to File a Complaint in the C.P.

Action.  (Ex. M-2).

12. On November 7, 2014, McDuffy filed a complaint on the Thorpes' behalf in the C.P.

Action.  (Id.).

13. On November 26, 2014 Nationwide filed preliminary objections to the complaint.  (Id.).

14. At no time between February 2014 and February 2015 did the Debtor seek Mr. McDuffy's

appointment as special counsel.

### The State Court Insurance Litigation: Mirarchi's Retention and Fee Agreement

15. In late November 2014, a mutual acquaintance of the Thorpes and Mr. Mirarchi contacted

Mr. Mirarchi regarding the possibility of Mirarchi substituting in for Mr. McDuffy as

counsel for the Thorpes in the C.P. Action.  (8/3/16 N.T. at 15-16, 125-27; 8/8/16 N.T. at

92-93, 135).

16. At that time, Mr. Mirarchi was an attorney licensed to practice law in Pennsylvania.

(8/3/16 N.T. at 13).

17. On November 29, 2014, Mr. Mirarchi met with Mr. Thorpe at the Farm.  (8/3/16 N.T. at

17; Ex. M-4).[9]

---

[9]    The parties spent considerable trial time debating the topics that were discussed at this

(continued...)

18.   Mr. McDuffy also met with Mr. Mirarchi and then recommended that the Thorpes retain

Mr. Mirarchi to replace him as their attorney in the C.P. Action.  (8/19/16 N.T. at 13-14).

19.   On December 15, 2014, Mr. McDuffy hand delivered his file on the C.P. Action to

Mirarchi.  (8/3/16 N.T. at 50).

20.   The Thorpes' response to the preliminary objections was due on December 23, 2014.  (Id.).

21.   Through a series of text messages exchanged by Mr. Thorpe and Mr. Mirarchi, the Thorpes

engaged Mirarchi to represent them in the C.P. Action.  (Ex. M-6 at 3).

22.   Prior to receiving a signed fee agreement, but considering himself "retained," (8/3/16 N.T.

at 131; see also 8/8/16 N.T. at 164-65; Ex. M-6 at 3), and facing what he considered to be a

filing deadline in the C.P. Action, Mirarchi filed an Amended Complaint in the C.P. Court

on December 23, 2014.  (8/3/16 N.T. at 50, 57-58, 62, 131, 140).

23.   Due to what he considered the exigency of the filing deadline, Mr. Mirarchi did not have

the Thorpes review and verify the Amended Complaint, but instead filed it by attaching a

signed verification that was included in the file he received from Mr. McDuffy.  (Id. at 63-

---

[9](...continued)
initial meeting.  Mr. Mirarchi testified that the primary purpose of the meeting was to assess the
Nationwide insurance claim, but agreed that other matters were also discussed  (8/3/16 N.T. at 17, 36, 43;
see also 8/8/16 N.T. at 96).  One of those issues was the potential for obtaining financing for the Farm.
(See Ex. M-5).  Mr. Thorpe disputed this, asserting Mr. Mirarchi was consulted only about possibility of
obtaining investors for the Farm.  Mr. Thorpe appeared to be implying that Mr. Mirarchi engaged in a
kind of "bait and switch" tactic.  (8/8/16 N.T. at 135-36; see also Ex. M-5).

       To decide the Motion, it is not necessary to resolve this fact issue.  It is not material
because it is indisputable that the Thorpes retained Mirarchi to represent them in the C.P. Action.  (See
Ex. M-13; 8/8/16 N.T. at 144; see also Proposed Finding of Fact Nos. 22, 26, infra).

64; see also 8/8/16 N.T. at 140-42).[10]

24. On February 13, 2014, also prior to receiving a signed fee agreement, Mirarchi filed a

   response to Nationwide's preliminary objections. (Ex. M-2).[11]

25. In late February 2014, Mr. Mirarchi contacted Mr. Thorpe by email to request that Mr.

   Thorpe and the Debtor sign and return a contingent fee agreement ("the Mirarchi Fee

   Agreement") to retain Mirarchi to represent them in the Nationwide insurance litigation.

   (Ex. M-12).

26. On March 4, 2015, the Thorpes signed the Mirarchi Fee Agreement.  (Ex. M-13; 8/3/16

   N.T. at 18-19).[12]

27. The Mirarchi Fee Agreement provides that Mirarchi's compensation "shall be determined

   as follows: Thirty-Five percent (35%) of the funds derived by suit or amicable settlement."

---

[10]   Mr. Mirarchi testified that he had Mr. Thorpe's verbal consent to file the Amended
Complaint without the prior review and by attaching the prior signed verification.  (8/3/16 N.T. at 64,
67).

[11]   Even though he had already filed the Amended Complaint, apparently there was an issue
whether the preliminary objections were resolved by the filing of the Amended Complaint.  As a result,
Mr. Mirarchi filed the response to the preliminary objections.  Subsequently, Nationwide agreed not to
press the preliminary objections.  See Proposed Finding of Fact No. 29, infra.

[12]   The Debtor testified that she never met with Mr. Mirarchi; Mr. Mirarchi does not dispute
this. (8/3/16 N.T. at 56-57; 8/8/16 N.T. at 116).   The Debtor went further, testifying that she did not
authorize Mr. Thorpe to retain Mr. Mirarchi on their collective behalf.  (8/8/16 N.T. at 118).

   I do not credit the Debtor's testimony on this point.  I believe Mr. Mirarchi's testimony
that, in their initial meeting, Mr. Thorpe represented that he had the authority to retain him on the
Debtor's behalf.  (8/3/16 N.T. at 17).  I find both that the  representation was made and that it was
accurate. My observation of the Thorpes' conduct throughout this bankruptcy case convinces me that the
Debtor routinely authorized Mr. Thorpe to act on their collective behalf with respect to matters that
affected the Farm.  Mirarchi's retention was just one example of that grant of authority.   In any event,
the Debtor signed the Mirarchi Fee Agreement on March 4, 2015 and there is no credible argument that
the signature on the document is not hers.

(Ex. M-13).[13]

28.   The Mirarchi Fee Agreement authorized Mirarchi to prosecute the C.P. Action and to settle

or compromise the claim with the Thorpes' consent.  (See Ex. M-13).


### Developments in the Nationwide Litigation - February 2015 to August 2015

29.   On or about February 23, 2015, Nationwide's attorney communicated to Mr. Mirarchi its

agreement that the filing of the Amended Complaint mooted Nationwide's preliminary

objections.  (8/3/16 N.T. at 131).

30.   On April 2, 2015, Mr. Mirarchi advised Mr. Thorpe that he had granted Nationwide an

extension of time to file an Answer to the Amended Complaint and that, thereafter, he

would conduct discovery, including interrogatories and depositions.  (Ex. M-14).

31.   On April 29, 2015, Nationwide filed an Answer to the Amended Complaint in the C.P.

Action.  (Ex. M-2).

32.   Neither side in the C.P. Action conducted any discovery between April 2015 and August

25, 2015.  (8/3/16 N.T. at 131-32).[14]

---

[13]      The Mirarchi Fee Agreement also authorizes Mirarchi to pay expert and witness fees and
other costs from the litigation proceeds.  Presumably, this would permit Mirarchi to be reimbursed for
such expenses if Mirarchi advanced the payment for them.  There are no disputes regarding litigation
expenses.


[14]      Mr. Mirarchi testified that the inactivity was due to both counsel's trial schedules.
(8/3/16 N.T. at 131-32).  He also testified that he drafted interrogatories that he did not serve prior to
August 25, 2015.  (8/3/16 N.T. at 86).

## The Administrative Suspension of Mr. Mirarchi's License to Practice Law

33. By order dated July 15, 2015, the Supreme Court of Pennsylvania placed Mr. Mirarchi on administrative suspension ("the Suspension Order") pursuant to Pa. R.C.L.E. 111(b) due to his failure to comply with his continuing legal education ("CLE") obligations. (Exs. M-38, M-42).

34. The July 15, 2015 Suspension Order took effect thirty (30) days later, i.e., August 14, 2015. (See Exs. M-38, M-42).

35. Mr. Mirarchi learned of the suspension of his license on August 13 or 14, 2015, after receiving an e-mail from the Pennsylvania Disciplinary Board.  (8/3/16 N.T. at 110-11, 113).[15]

36. Once Mirarchi learned of his administrative suspension, he promptly (within a few days) fulfilled his CLE obligations.  (Id. at 111).

37. On August 28, 2015, the Pennsylvania CLE Board sent Mr. Mirarchi a letter that:

    a. confirmed that he had complied with his 2014 and 2015 CLE requirements; and

    b. advised him the Disciplinary Board had "mailed out the necessary paperwork .  .  .  in order to remove the administrative suspension;" and

    c. advised him that upon receipt of the completed forms and requisite fees, the Disciplinary Board "**will** authorize your reinstatement."

(Ex. M-16) (emphasis added).

38. Mirarchi was not reinstated to active status as an attorney until September 16, 2015.  (See Ex. M-42).

---

[15]    Mirarchi claims he did not receive the July 15, 2015 Suspension Order, which he attributes to a change in the location of his law practice.  (8/3/16 N.T. at 110-11, 148-49).

39.    At no time during his administrative suspension did Mr. Mirarchi inform the Thorpes of the

       suspension.  (8/3/16 N.T. at 113).


## The Nationwide Settlement Offer

40.    On August 25, 2015, while his law license was suspended, Mirarchi engaged in a

       telephonic settlement negotiation with Nationwide's counsel.  (8/3/16 N.T. at 23-24, 132).

41.    The August 25, 2015 negotiation was the first settlement discussion after Nationwide filed

       its Answer to the Amended Complaint.  (Id. at 84).

42.    In that negotiation, which involved an initial offer by Nationwide and a counteroffer by Mr.

       Mirarchi, Nationwide made a settlement offer of $324,729.30 ("the Nationwide Settlement

       Offer").  (Id. at 24; 8/8/16 N.T. at 40).[16]


## Communications After the Nationwide Settlement Offer

43.    Mr. Mirarchi communicated the Nationwide Settlement Offer to Mr. Thorpe by text and e-

       mail.  (8/3/16 N.T. at 24-25; 8/8/16 N.T. at 94; Ex. M-6, at 13-14).[17]

44.    At that time, Mr. Mirarchi was aware that a mortgage holder (i.e., Lititz) might lay claim to

       the potential settlement proceeds.  (8/8/16 N.T. at 95-96; Ex. M-6, at 13; see also Ex. M-

---

[16]    Strictly speaking, this proposed finding is a slight overstatement.  In the August 25, 2015
discussion, Nationwide's counsel made a settlement offer of $250,000.00.  Mr. Mirarchi countered at
$345,000.00.  Nationwide's counsel advised Mr. Mirarchi that if he communicated that the Thorpes
would accept $324,729.30, "I would go back [to Nationwide] and get that figure."  (Ex. M-15, at 14; see
also Exs. M-26, M-27).


[17]    It appears from the correspondence that the offer Mr. Mirarchi first communicated to Mr.
Thorpe was for $250,000.00 and that he did not communicate the higher $324,729 until September 14,
2015.  (Ex. M-6, at 13-14).

25).

45. In response, Mr. Thorpe advised Mr. Mirarchi that the Nationwide Settlement Offer would

have to be discussed with the Debtor's bankruptcy counsel. (8/8/16 N.T. at 95).

46. As a result, over the next few weeks, Mr. Mirarchi communicated with Mr. Thorpe and the

Debtor's bankruptcy counsel's office by numerous e-mails and texts seeking:

  a. express authority from the Thorpes to accept the Nationwide Settlement Offer;[18]
     and

  b. the Debtor's filing of a motion appointing him as special counsel to the Debtor;[19]

  c. to allay the Thorpes' concern that they might not receive any of the settlement
     proceeds due to Lititz's claim against the proceeds.

(8/3/16 N.T. at 102-03, 105-06; Ex. M-6, at 13-17; Exs. M-17, M-18; Ex. M-20, at 1; Exs.

M-24; M-26; M-27; M-29).

47. On September 4, 2015, following a telephone conversation with the Debtor's bankruptcy

counsel, Roger Ashodian ("Mr. Ashodian") and Mr. Ashodian's non-lawyer assistant, Brian

Gerstel ("Gerstel"), Mr. Mirarchi sent Mr. Ashodian a copy of the Mirarchi Fee Agreement

and his curriculum vitae in preparation for the filing of a motion for approval of the

Nationwide settlement, for Mirarchi's appointment as counsel and for allowance of

---

[18]     Mr. Mirarchi testified that "early on  . . .  around August 25th," Mr. Thorpe approved the
settlement "either by telephone or text message" provided that "it's okay with Herb McDuffy." (8/3/16
N.T. at 32; see also id. at 107). Mr. Mirarchi testified that Mr. McDuffy did endorse the settlement by
text or e-mail. (Id. at 33; see also id. at 133-35). However, Mr. Mirarchi believed that Mr. Thorpe's
consent also was conditioned on obtaining bankruptcy court approval. (Id. at 108, 147). As a result, Mr.
Mirarchi pressed on with his efforts to obtain firm settlement authorization from the Thorpes and
bankruptcy court approval.


[19]     Some of the communications regarding the appointment of Mirarchi as special counsel
were to and from Mr. Silver, acting on Mirarchi's behalf.

Mirarchi's contingent fee as compensation.  (Ex. M-17; see also 8/3/16 N.T. at 25-26).

48. By e-mail dated September 9, 2015, Gerstel advised Mr. Mirarchi that Mr. Ashodian had

    "decided for strategic reasons not to file the application as of yet, but he would like

    everything in place to file it soon."  (Ex. M-19).

49. At no time did the Debtor file an application to appoint Mirarchi as counsel.

50. Starting in mid-September 2015, both Mr. Thorpe and the Debtor's bankruptcy counsel

    requested further details regarding administrative suspension, including the specific dates

    of the suspension.    (Exs. M-21, M-22, M-23).

51. In response, on October 2, 2015, Mr. Mirarchi sent the Thorpes a four (4) page letter which

    a. urged the Thorpes to go forward with the Nationwide settlement, with the
       understanding that he would work diligently to make sure that they would
       "receive as much of the proceeds as possible;"

    b. did not provide specific information regarding the duration of the administrative
       suspension, but sought to assure the Thorpes and their counsel that the
       administrative suspension was a non–issue;

    c. responded to complaints recently raised by Mr. Thorpe regarding an asserted lack
       of communication regarding the Insurance Litigation and deficiencies in the
       content of the Amended Complaint drafted by Mr. Mirarchi.

(Ex. M-24).[20]

---

[20]    In the October 2nd letter, Mr. Mirarchi stated that

        -   his settlement discussions with Nationwide's attorney on August 25,
            2015, occurred after he completed his delinquent CLE credits;

        -   his administrative suspension "in now [sic] way effected [sic] my
            representation of you;"

        -   his administrative suspension "was in no way constitutionally disabling
            as to my ability to work"

        -   "[a]t all material times, I was a Member of the Bar of our
            Commonwealth's Supreme Court."

(Ex. M-24).

52. By mid-October, the tone of Mr. Mirarchi's communications to the Thorpes regarding the

    need to accept the Nationwide Settlement Offer intensified and included criticism of the

    Debtor's bankruptcy counsel.

53. In the course of an eighteen (18) day period between October 15, 2015 and November 2,

    2015, Mr. Mirarchi sent the Thorpes four (4) letters regarding the settlement.  These letters,

    which were sent after the auction of the Farm, suggested that the strength of the Thorpes'

    case against Nationwide was uncertain and included criticism of the Debtors bankruptcy

    counsel:

    - "[I]f we go forward  – without you possessing the [Farm] property – we have
      a very weak case because the purpose for most of the money is to repair the
      real property."  (Ex. M-26; see also Ex. M-30).

    - "If we settled the matter before the auction, you would have had the money to
      stop it."  (Ex. M-26; see also Ex. M-30).

    - "I heard the appellate arguments being made for you [challenging the
      bankruptcy court confirmation of the auction sale].  I am sorry, but
      professionally speaking, I was unimpressed."  (Ex. M-26).

    - "I know you feel your claims are worth millions.  However, receiving a lesser
      amount now – being sooner, rather than later – can be better for you at this
      time."  (Ex. M-27).

    - "Your case is lacking expert witnesses.  It will be unlikely that we can
      establish the values of your claims without these witnesses to support them.  It
      is even more difficult now that we do not have the Farm."  (Id.; see also Ex.
      M-30).

    - "I will fight the Bank to get you as much money as possible.  I have already
      formulated legal theories to that effect."  (Ex. M-27; see also Ex. M-30).

    - "The only way you and Renee can get any money out of this possible
      settlement is if you cooperate with me.  These other Lawyers you are listening
      to are causing you to lose everything.  Kindly realize that.  (Ex. M-28).

-18-

**Mirarchi's Termination as Debtor's Counsel in the Insurance Litigation**

54. By e-mail dated November 23, 2015, Mr. Thorpe advised Mr. Mirarchi that the Thorpes were terminating Mirarchi as their attorney in the C.P. Action. (See Ex. M-31).

55. In response to the November 23, 2015 e-mail, Mr. Mirarchi advised the Thorpes by letter that, in addition to the e-mail from Mr. Thorpe, he required a signed termination notification from the Debtor.  (Ex. M-32; see also 8/3/16 N.T. at 46-47).

56. On December 31, 2015, Mr. Mirarchi received a signed copy of the e-mail terminating him as counsel.  (See Ex. M-34).

57. The Thorpes' discharge of Mr. Mirarchi as counsel was based, in significant part, on his administrative suspension, his failure to advise them of the suspension and what they considered to be his inadequate responses to their inquiries regarding the suspension. (8/8/16 N.T. at 155, 180-81).[21]

58. At no time during the period in which Mirarchi represented the Thorpes in the Insurance Litigation did the Thorpes agree to accept the Nationwide Settlement Offer.

---

[21]     This finding is based, in part on the express testimony in the record and, in part, on inferences that I draw from the testimony.  Mr. Thorpe had other complaints about Mr. Mirarchi's representation.  Mr. Thorpe complained about a lack of communication; he thought that the Amended Complaint filed by Mr. Mirarchi was flawed; he felt the Nationwide Settlement Offer was too low.

        To the extent that the Thorpes contend that Mr. Mirarchi's representation in general was sub-par, they did not prove this point at trial.  Their evidence on the issue was little more than a conclusory expression of lay opinion.

        Whatever the strength of the Thorpes' case may have been on this point, their feelings about the lack of quality representation undoubtedly were a factor in the decision to discharge Mr. Mirarchi.  However, based on my consideration of all of the evidence, I am satisfied that Mr. Mirarchi's conduct in dealing with the Thorpes regarding his administrative suspension also was a material factor in their decision to discharge him as counsel.

### McDuffy's Re-Entry and the Thorpes' Acceptance of the Settlement

59. On or about January 4, 2016, the Thorpes again engaged Mr. McDuffy to represent them in
the C.P. Action.  (Ex. D-2).

60. Mr. McDuffy re-entered his appearance in the C.P. Action on January 27, 2016.  (Ex. M-2).

61. At no time before or after Mr. McDuffy's reentry of his appearance in the C.P. Action did
the Debtor seek Mr. McDuffy's appointment as special counsel.

62. Without any further negotiation regarding the amount of the settlement, Mr. McDuffy
accepted the Nationwide Settlement Offer on the Thorpes' behalf.  (8/19/16 N.T. at 26, 43-
44).

63. Although they considered the settlement offer to be too low, the Thorpes nevertheless
accepted it in order to reach a settlement with Lititz that would protect their residential
property.  (Id. at 149, 151, 189-91).

64. On June 23, 2016, by praecipe, the C.P. Action was marked "settled, discontinued and
ended."  (Ex. M-2).


## IV.  PROPOSED CONCLUSIONS OF LAW

1. The bankruptcy court has subject matter jurisdiction in this matter.

2. The bankruptcy court may exercise only non-core jurisdiction pursuant to 28 U.S.C.
§1334(b) and 28 U.S.C. §157(c)(1) and therefore, may not enter a final order.

3. The Thorpes' termination of Mirarchi's representation prior to their acceptance of the
Nationwide Settlement Offer terminated the Mirarchi Fee Agreement and Mirarchi's right
to recover legal fees as a matter of contract.

-20-

4.     In the absence of a right of recovery by contract, Mirarchi retained a potential right to
recover under the doctrine of <u>quantum meruit</u>.

5.     Mr. Mirarchi violated the Pennsylvania Rules of Professional Conduct by failing to advise
the Thorpes of his administrative suspension and by continuing to practice law during the
period of his administrative suspension.

6.     The Thorpes' termination of Mirarchi's representation prior to their acceptance of the
Nationwide Settlement Offer was based on Mirarchi's wrongful conduct and, under
applicable nonbankruptcy law, precludes any recovery in <u>quantum meruit</u>.

## V. JURISDICTION

This matter involves a dispute arising in a post-confirmation contract between a debtor and
her former attorney.  The outcome of the dispute affects the disposition of certain insurance
proceeds, a portion of which may be payable to the holder of an allowed secured claim as a result
of a settlement approved as part of the claims resolution process.  The jurisdictional issues
presented are:

(1) does the bankruptcy court have subject matter jurisdiction;[22] and

(2) if so, may the court enter a final order?

As explained below, I conclude that the court has subject matter jurisdiction and that this is

---

[22]     No party has questioned the court's subject matter jurisdiction.  However, the bankruptcy
court has an independent duty to consider its subject matter jurisdiction and to do so <u>sua sponte</u>, if
necessary.  <u>See, e.g.</u>, <u>Nesbit v. Gears Unlimited, Inc.</u>, 347 F.3d 72, 76-77 (3d Cir. 2003), <u>cert. denied</u>, 541
U.S. 959 (2004); <u>In re Mullarkey</u>, 536 F.3d 215, 220 (3d Cir. 2008); <u>In re Olick</u>, 2010 WL 4509828, at *1
n. 5 (Bankr. E.D. Pa. Nov. 9, 2010).

a non-core matter.  One of the parties to the dispute, Mirarchi, has not consented to the entry of a

final order by the bankruptcy court.    (Mirarchi Pretrial Statement) (Doc. # 597).  Therefore, this

court will submit proposed findings of fact and conclusions of law to the district court.  <u>See</u> Fed.

R. Bankr. P. 9033(a).


### A.  Subject Matter Jurisdiction: General Principles

**1.**

In 2015, I summarized the jurisdictional framework in bankruptcy cases as follows:

> [B]ankruptcy subject matter jurisdiction is conferred by 28 U.S.C. §1334(a) and (b)
> potentially extends to four (4) types of title 11 matters:
>
> (1) cases under title 11;
> (2) proceedings arising under title 11;
> (3) proceedings arising in a case under title 11; and
> (4) proceedings related to a case under title 11.
>
> •  •  •
>
> According to the text of the Judicial Code, all  .  .  .   matters [in which a bankruptcy
> court may exercise subject matter jurisdiction], other than the bankruptcy case itself, may
> be classified into two (2) categories:
>
> (1) core proceedings arising under title 11; and
> (2) non-core proceedings that are otherwise related to a case under title 11.[23]

<u>In re Universal Mktg., Inc.</u>, 541 B.R. 259, 305-06 (Bankr. E.D. Pa. 2015) (quotations and case

---

[23]     There is a third category of matters in the bankruptcy jurisdictional universe: matters that
Congress has designated as "core," but over which the bankruptcy court lacks constitutional authority to
enter final orders.  <u>See</u> <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011). Since I have determined that the
present matter is non-core, I will not discuss this third category.

citations omitted).[24]

The core/non-core distinction is significant because it determines the bankruptcy court's level of decision making authority.  See  In re Seven Fields Dev. Corp., 505 F.3d 237, 254 (3d Cir. 2007).  The bankruptcy court has the statutory authority to determine all core matters. See 11 U.S.C. §157(b)(1).  In a non-core proceeding, the bankruptcy court may not enter a final judgment, but may only submit proposed findings of fact and conclusions of law to the district court for de novo review, unless all parties agree that a final judgment may be entered by the bankruptcy court. See 28 U.S.C. §157(c); see also Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999).

Only after a bankruptcy court is satisfied that it has subject matter jurisdiction is it necessary to determine whether its jurisdiction is core or non-core and whether it has the authority to enter a final order or only proposed findings of fact and conclusions of law.

## 2.

Aside from its main function of establishing whether the bankruptcy court may enter a final order, the core/non-core distinction also provides some guidance in analyzing the preliminary question of the existence of subject matter jurisdiction itself.

The concept of a core proceeding is "anchored in" two (2) of the jurisdictional grounds stated in 28 U.S.C. 1334(b): those "that 'arise under' and those that 'arise in' the bankruptcy

---

[24]        The jurisdiction conferred by 11 U.S.C. §1334 is vested in the district court, but the district court has the authority to refer bankruptcy cases and proceedings to the bankruptcy court. 28 U.S.C. §157(a). In this district, the district court has done so. See Standing Orders of the District Court dated July 25, 1984 and November 8, 1990.

case." Universal Mktg., 541 B.R. at 306.  As one court explained:

> Core proceedings represent those disputes that are so intertwined with the bankruptcy
> process that Congress has the power, under Article I of the Constitution, to direct a
> non-tenured judicial officer (i.e., bankruptcy judge) to render a final determination of
> their merits.

In re Porter, 295 B.R. 529, 535 (Bankr. E.D. Pa. 2003).

By comparison, the iconic test for determining whether a matter is merely "related to" the

bankruptcy case sets a lower standard:

> whether *the outcome of that proceeding could conceivably have any effect on the
> estate being administered in bankruptcy*  .  .  .   An action is related to bankruptcy if
> the outcome could alter the debtor's rights, liabilities, options or freedom of action
> (either positively or negatively) and which in any way impacts upon the handling and
> administration of the bankrupt estate.

Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original) (citations

omitted).

Under Pacor, most questions involving the scope of the court's "related to" jurisdiction are

determined by focusing on the effect, if any, that resolution of the dispute may have on the

bankruptcy estate. "Typically, litigation which is related to a bankruptcy case is litigation which

will affect in some manner the property to be administered by the bankruptcy trustee or the

amount or priority of claims to be repaid."  In re Shuman, 277 B.R. 638, 647 (Bankr. E.D. Pa.

2001); see also  Celotex Corp. v. Edwards, 514 U.S. 300, 308 n. 6 (1995) ("bankruptcy courts

have no jurisdiction over proceedings that have no effect on the estate of the debtor").

Comparison of the two (2) types of proceedings, core and non-core, suggests that one can

conceptualize core matters as a subset of those matters that are "related to" a bankruptcy case:

> [E]very core proceeding necessarily is also "related to" the bankruptcy case for
> purposes of 28 U.S.C. 1334(b). One might say that every core proceeding is related,

but not every related proceeding is core **and that a matter must at least be related to the bankruptcy for the bankruptcy court to exercise any type of subject matter jurisdiction**.

In re Universal Mktg., Inc., 459 B.R. 573, 579 (Bankr. E.D. Pa. 2011) (emphasis added).

This discussion illustrates, at the risk of some oversimplification, that the existence or lack of subject matter jurisdiction ultimately comes down to whether the outcome of a dispute is sufficiently "related to" the bankruptcy case to warrant the exercise of jurisdiction by the bankruptcy court.   Core matters are intertwined with the bankruptcy process and therefore, are necessarily related to the bankruptcy case for jurisdictional purposes.   Depending on the circumstances, non-core matters may or may not be sufficiently related to the bankruptcy case for purposes of subject matter jurisdiction.

### B.   The Bankruptcy Court Has Subject Matter Jurisdiction in this Matter

The "relatedness" of the Mirarchi Motion and the manner in which its outcome may affect the administration of this bankruptcy case are not difficult to discern.

The Lititz Settlement, which resolved an objection to Lititz's proof of claim, provides that if the Mirarchi Motion is denied and some or all of the Disputed Funds are not payable to Mirarchi, Lititz will be entitled to receive an additional distribution of $9,400.00 on account of its allowed secured claim.[25]   In this way, the outcome of the Mirarchi Motion impacts an aspect of case administration – specifically the distribution on account of an allowed claim (Lititz's) in the manner provided in the Lititz Settlement.   That is a sufficient basis for the exercise of

---

[25]    (See Trustee's Objection to Debtor and Mr. Thorpe's Motion for Release of Funds) (Doc. # 640).

bankruptcy jurisdiction.  See, e.g., Shubert v. Roche Holding AG, 157 F. Supp. 2d 542, 545

(E.D. Pa. 2001) (citing cases).[26]

---

[26]    In determining that the court has subject matter jurisdiction, I have applied the Pacor test for "relatedness" rather than the principles stated in In re Resorts Int'l, Inc., 372 F.3d 154 (3d Cir. 2004) regarding the scope of post-confirmation bankruptcy jurisdiction.

In Resorts, a chapter 11 case, the court observed that bankruptcy jurisdiction "is limited after confirmation of plan."  372 F.3d at 168.  For bankruptcy jurisdiction to exist post-confirmation, a matter in litigation "must affect an integral aspect of the bankruptcy process – there must be a close nexus to the bankruptcy plan or proceeding."  Id. at 167.  The Resorts court described the "close nexus" test as involving "the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement."  Id. at 168-69.  In its discussion, that court appeared to suggest that the mere fact that the reorganized debtor or a liquidation trust created by a confirmed chapter 11 plan may recover money that could be distributed to creditors does not, by itself, create a "close nexus" in the post-confirmation environment.  See id. at 168.

The effect of the entry of the confirmation order in a chapter 11 case differs significantly from that in a chapter 12 case.

Conceptually, upon confirmation, a chapter 11 debtor has, to some extent, "exited" bankruptcy, having become the "reorganized debtor."  In Resorts, the court emphasized that, ordinarily, upon confirmation of a chapter 11 plan, the bankruptcy estate ceases to exist.  372 F.3d at 165; see 11 U.S.C. §1141(b) (unless otherwise provided by the plan or order confirming the plan, "the confirmation of a plan vests all of the property of the estate" in the reorganized debtor).  Not so in a chapter 12 (or chapter 13) case.

By comparison, in chapter 12 and chapter 13 cases, the debtor remains "the debtor" through the end of the case.  Further, while property of the estate vests in the debtor upon confirmation, see 11 U.S.C. §1227(b), the bankruptcy estate is replenished by property acquired by the debtor post-confirmation and "before the case is closed, dismissed, or converted to a case under chapter 7."  11 U.S.C. §1207(a)(1); see, e.g., In re Clouse, 446 B.R. 690 (Bankr. E.D. Pa. 2010) (under equivalent chapter 13 Code provision, 11 U.S.C. §1306(a), "[a]fter plan confirmation, all property, including earnings, received by a debtor is property of the estate"); accord In re Chang, 438 B.R. 77, 84 (Bankr. M.D. Pa. 2010) (same).  It also is worth noting that in many chapter 11 cases, the debtor receives a discharge upon confirmation.  See 11 U.S.C. §1141(d).  By comparison, in chapter 12 (and chapter 13), the discharge is not granted until "completion by the debtor of all payments under the plan."  11 U.S.C. §1228(a), 1328(a).

In chapter 12, the continued existence of a bankruptcy case trustee whose duties include ensuring that the debtor makes the payments required by the confirmed plan and filing a final accounting of the administration of the estate, see 11 U.S.C. §1202(b)(1), (4), and the continued existence of the bankruptcy estate post-confirmation manifest a continuing role for the bankruptcy court in the distribution, plan completion and discharge processes after confirmation of a chapter 12 plan during the potentially five (5) year life of the plan, see 11 U.S.C. §1222(c). far more extensive than the contemplated role of the bankruptcy court after confirmation of a chapter 11 plan.

(continued...)

## C.  This Contested Matter Is a Related Proceeding

### 1.

Having determined that the bankruptcy court has subject matter jurisdiction, I must now

decide whether this matter is core or non-core.

The Court of Appeals has provided guidance for determining whether a matter over which a

bankruptcy court may exercise jurisdiction is core or non-core:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core
> proceeding; for example, an action by the trustee to avoid a preference. If the
> proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for
> example, the filing of a proof of claim or an objection to the discharge of a particular
> debt. If the proceeding does not invoke a substantive right created by the federal
> bankruptcy law and is one that could exist outside of bankruptcy it is not a core
> proceeding; it may be related to the bankruptcy because of its potential effect, but
> under section 157(c)(1) it is an otherwise related or non-core proceeding.

In re Guild and Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996) (quoting In re Wood, 825

F.2d 90, 97 (5th Cir. 1987)); accord In re Exide Technologies, 544 F.3d 196, 206 (3d Cir. 2008);

Halper, 164 F.3d at 836.  Of course, as part of the process of applying these principles, the

bankruptcy court must consult the illustrative examples of core proceedings set forth in 28

U.S.C. §157(b). See Exide Technologies, 544 F.3d at 206; see also n.7, supra (bankruptcy court

does not have constitutional authority to enter final orders in every matter designated as core

proceedings by Congress).

The Mirarchi Motion is a non-core matter.

To understand why, it is helpful to begin by examining the underlying insurance claim

against Nationwide.  That claim was derived from prepetition fire and storm damage to the Farm.

---

[26](...continued)
        All of the differences described above have a jurisdictional consequence, making it
appropriate to apply the traditional Pacor "relatedness" test in a chapter 12 case after plan confirmation,
rather than the narrower Resorts test.

As such, the claim was property of the bankruptcy estate upon the commencement of the case,

see 11 U.S.C. §1207(a), but the claim existed independent of the bankruptcy case and did not

involve any rights created by the Bankruptcy Code.  Nor did the claim involve any matters

described in 28 U.S.C. §157(b)(2)(A)-(O).  As such, under the test stated in Guild and Gallery

Plus, the insurance claim was non-core.  Accord In re GACN, Inc., 555 B.R. 684, 694-98 (B.A.P.

9th Cir. 2016) (dispute concerning the parties' rights and liabilities under a prepetition insurance

contract is non-core).

The dispute between the Thorpes and Mirarchi arises from a contract they entered into in

which Mirarchi agreed to provide legal services to assist the Thorpes in prosecuting their non-

core claim against Nationwide.  The timing of the Mirarchi-Thorpe contract is significant.  The

Mirarchi-Thorpe attorney-client relationship was created in the December 2014-March 2015 time

period, see Proposed Finding of Fact Nos. 21-25, many months after the January 23, 2014

confirmation of the Debtor's chapter 12 plan.  Confirmation of the plan vested the bankruptcy

estate's interest in the Nationwide insurance proceeds in the Debtor; after confirmation of the

Debtor's interest in the insurance proceeds was no longer property of the bankruptcy estate.  See

11 U.S.C. §1227(b).

Thus, when viewed from the proper perspective, Mirarchi was retained by the Debtor and

Mr. Thorpe, post-confirmation, to assist them in collecting a non-estate asset.  This renders the

connection between the Insurance Litigation and the post-confirmation administration of the

bankruptcy case tenuous, especially because no provision in the confirmed plan imposed any

obligation on the Debtor to use any of the proceeds of the Nationwide claim to pay any of the

claims allowed in the bankruptcy case.  Indeed, absent the Debtor's objection to Lititz's proof of

claim, that resulted in the Lititz Settlement and the potential for the Disputed Funds to augment

the distribution on account of Lititz's allowed claim, it is hard to see how the Nationwide

insurance proceed would have had any effect on the bankruptcy case.  Without the Lititz

settlement, bankruptcy jurisdiction might not even exist, much less core jurisdiction.[27]  Further,

the dispute between the Thorpes and Mirarchi over the Disputed Funds, a product of  the

Debtor's (non-core and subsequently non-estate) insurance claim, is a contractual dispute

governed by Pennsylvania law[28] that "does not invoke a substantive right created by the federal

bankruptcy law and is one that could exist outside of bankruptcy."  <u>Guild and Gallery Plus</u>, 72

F.3d at 1178.

All of these considerations dictate the conclusion that this contested matter regarding the

competing claims of Mirarchi, the Thorpes (and Lititz, by virtue of the Lititz Settlement) to the

Disputed Funds is a non-core proceeding.

## 2.

In concluding that this is a non-core matter, I have considered the Trustee's Objection to

the Mirarchi Motion, (Doc. # 590), in which the Trustee asserts that the Insurance Litigation

remained property of the bankruptcy estate after confirmation of the Debtor's chapter 12 plan.

However, I am unpersuaded by the Trustee's contention.

---

[27]    The general rule is that the bankruptcy court's jurisdiction lapses after property leaves
the bankruptcy estate.  <u>See, e.g.</u>, <u>In re Gardner</u>, 913 F.2d 1515, 1518 (10th Cir. 1990); <u>see also</u> <u>In re Hall's
Motor Transit Co.</u>, 889 F.2d 520, 523 (3d Cir. 1989).  However, due to the somewhat unusual
circumstances in this case  – primarily, the terms of the Lititz Settlement  -- this case is an exception to
the general rule.

[28]    All the parties have assumed that, to the extent state law is relevant, Pennsylvania law
applies in this contested matter.  I accept the parties' assumption, which also seems correct.

11 U.S.C. §1227(b) provides:

> Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

The Trustee asserts that the Debtor's confirmed plan "otherwise provided," overriding the automatic vesting of the Debtor's interest in the insurance proceeds and therefore, the Debtor's interest in the Nationwide insurance proceeds remained property of the bankruptcy estate after confirmation of the chapter 12 plan.[29]

The Trustee bases his position on Paragraph 3.A.i. of the Modified Confirmed Plan, (Doc. # 286), which was approved postconfirmation November 14, 2014, (Doc. # 290). Paragraph 3.A.i. of the Modified Confirmed Plan provides:

> In the event that any further insurance proceeds are received under the Debtor's insurance policies the parties may file an appropriate motion seeking review of the proposed distribution and application of process.

If the Trustee is correct, and the Disputed Funds are property of the bankruptcy estate, this contested matter could be conceptualized as a bankruptcy court resolution of competing claims against estate property in the custody of the court, with the competing claimants being the Debtor, Mirarchi and various administrative expense claimants (the Trustee, the Trustee's counsel, and the Debtor's counsel). As such, this matter arguably would be a core matter under 28 U.S.C. §157(b)(2)(B) or (O). See generally In re Harris Pine Mills, 44 F.3d 1431, 1438 (9th Cir. 1995) (postpetition state law claims asserted against Chapter 11 trustee and its agents for

---

[29] The Trustee makes this argument in another context – i.e., in disputing Mirarchi's asserted right to impress a charging lien for unpaid counsel fees on the insurance proceeds. The Trustee contends that because the insurance proceeds remained estate property, no lien may be imposed on property of the estate after the commencement of the bankruptcy case without bankruptcy court approval. See 11 U.S.C. §§362(a)(5), 549. Nevertheless, the foundation of the argument – that the insurance proceeds are estate property – potentially impacts the core/non-core determination.

conduct inextricably intertwined with trustee's administration of the case are core proceedings).

However, I need not analyze this theory further because the theory's underlying premise is

incorrect: the Debtor's interest in the Nationwide insurance proceeds is not property of the

bankruptcy estate.

I do not interpret Paragraph 3.A..i of the Modified Confirmed Plan as a revesting

provision that overrides the operation of 11 U.S.C. §1227(b).   Paragraph 3.A.i is a procedural

mechanism for addressing the tension that continuously existed between the Debtor and Lititz

during the case over the use of insurance proceeds.   The Debtor hoped to use those proceeds for

repairs and operations at the Farm, while Lititz preferred to receive d the proceeds to pay down

the outstanding debt.[30]   As such, Paragraph 3.A.i. is nothing more than a venue provision in

which the Thorpes and Lititz agreed to submit their disputes over the use of future insurance

proceeds to the bankruptcy court.   Significantly, the words "revesting" or "property of the estate"

are not found in Paragraph 3.A.i.   Further, nothing in the confirmed plan obligated the Debtor to

use the (non-estate) insurance proceeds to pay allowed secured claims.

Any doubt regarding the question is laid to rest by Paragraph 8 of the Initial Confirmed

Plan, as well as by Paragraph 8 of the Modified Confirmed Plan, both of which state

unequivocally that all property of the estate "will vest in the Debtor upon confirmation."   In other

words, under the plain language of the Initial Confirmed Plan, the Debtor's interest in the

insurance proceeds vested in the Debtor at confirmation and nothing in the Modified Confirmed

---

[30]      This tension first came to the fore in 2013, shortly after the commencement of the case.
At that time, the Thorpes entered into a partial settlement of their insurance claim against Nationwide for
$150,000.00 .  This occurred while Mr. Moldovsky was representing them.  By agreement, Mr.
Moldovsky received his fee. and by court order, the balance of the proceeds were divided between the
Thorpes and Lititz.  See Proposed Finding of Fact Nos. 6-8; Orders dated August 5, 2013 and October
16, 2013 (Doc. # 's 49, 71).

Plan purported to vest the property back into the bankruptcy estate.

The vesting provision of the confirmed plans defeats the argument that this proceeding is a core matter because the Nationwide insurance claim is estate property. Therefore, the litigation over the Disputed Funds is not a core matter and the bankruptcy court may only issue proposed findings of fact and conclusions of law.


### VI. THRESHOLD ISSUE:
### IS MIRARCHI BARRED FROM RECOVERY BECAUSE THE FIRM WAS NOT APPOINTED AS SPECIAL COUNSEL IN THE BANKRUPTCY CASE?

As discussed in more detail in Parts VII and VIII, infra, Mr. Mirarchi claims he is entitled to the Disputed Funds under Pennsylvania law, under both contract and quasi-contract legal theories. The Thorpes argue that, whatever the merits of Mirarchi's claim may be under state law, he is barred from recovery by bankruptcy law principles. Specifically, the Thorpes contend that the fact that Mirarchi was never appointed as special counsel by the bankruptcy court "is an absolute bar to recovery." (Thorpes' Proposed Findings and Memorandum of Law at 23 (unpaginated)) (Doc. # 633).[31]  Respectfully, I disagree.

The starting points in the Thorpes' argument are the legal propositions that (1) the bankruptcy court must approve the employment of a professional to provide services on behalf of the bankruptcy estate and (2) the payment of an employed professional with estate assets also requires court approval. See 11 U.S.C. §§327, 330. Those propositions are correct. Further, most courts have held that a chapter 12 debtor must obtain court approval to retain professionals.

---

[31]      The Trustee, too, takes this position. (See Trustee's Objection to Mirarchi Motion ¶22) (Doc. # 590).

See In re Swenson, 2013 WL 3776318, at *2 (Bankr. D. Kan. July 16, 2013); In re Stacy Farms,

78 B.R. 494, 499 (Bankr. S.D. Ohio 1987); Matter of Slack, 73 B.R. 382, 382 (Bankr. W.D. Mo.

1987).

   Assuming arguendo, that a chapter 12 debtor generally must obtain bankruptcy court

approval to employ professionals,[32] in the circumstances presented here, there was no such duty.

The flaw in the Thorpes' argument is that it overlooks the effect of confirmation of the Debtor's

chapter 12 plan.

   As discussed in Part V, supra, the Debtor's interest in the Nationwide insurance proceeds

vested in the Debtor upon confirmation of the plan.  11 U.S.C. §1227(b).  Further, no provision

of the confirmed plan obligated the Debtor to use insurance proceeds recovered post-

confirmation to pay any allowed claims.  Thus, the Debtor's post-confirmation pursuit of the

Nationwide insurance proceeds was entirely for her own benefit and future use, "free and clear of

any claim or interest of any creditor provided for by the plan."  11 U.S.C. §1227(c).  The

---

[32]    The courts holding that the bankruptcy court must approve the appointment of the
debtor's professionals in a chapter 12 case finds support in 11 U.S.C. §§1203, 1204, which describe the
chapter 12 debtor as a "debtor in possession" and clothe the debtor with most of the powers of a chapter
11 trustee. These courts reason that just as a chapter 11 debtor in possession must obtain court approval
to employ professionals, so too must a chapter 12 debtor.

        I note that the text and structure of the Code support a counter-argument.  In chapter 12,
like chapter 13 (a chapter in which a debtor is clothed with certain trustee powers and in which it is
indisputable that a debtor need not employ counsel), a separate trustee is appointed in every case.  Thus,
every chapter 12 case already has an estate fiduciary.  One might infer from this structure that the chapter
12 debtor's counsel, like the chapter 13 debtor's counsel, is representing the debtor and not the
bankruptcy estate, even though the chapter 12 debtor may employ various trustee powers.  This
distinction finds expression in 11 U.S.C. §330(a)(4)(B), which authorizes counsel to the debtor in a
chapter 12 case to be compensated by the estate for representing "the interests of the debtor," rather than
the interests of the estate.  See In re Acevedo, 2014 WL 6775272, at *1 (Bankr. W.D. Mich. Nov. 24,
2014).

        In this case, it is not necessary to decide the issue whether the court must appoint a
chapter 12 debtor's professionals.

bankruptcy estate had no interest in the Debtor's claim against Nationwide, making it entirely

unnecessary for the bankruptcy court to exercise any oversight over the debtor's conduct in

pursuing the claim.  It follows that the Debtor was free to retain any attorney she chose to

represent her in the C.P. Action.

It is true that, later, the situation changed.  In the Lititz Settlement, the Debtor agreed to

obligate a portion of her potential recovery to partially pay Lititz's an allowed claim.  In

functional terms, the approval of the Lititz Settlement modified the confirmed plan (which, as

explained earlier, is why this court has jurisdiction of the dispute between the Thorpes and

Mirarchi).  But, the nexus between the insurance proceeds and the administration of this case was

created after Mirarchi had already been both retained and discharged by the Thorpes.  It would be

absurd and inequitable to hold that the Bankruptcy Code requires court approval of a

professional's retention based on circumstances arising after the conclusion of the professional's

contractual relationship with the debtor.[33]

For these reasons, I reject the Thorpes' argument that the Bankruptcy Code precludes

Mirarchi from asserting a claim against the Disputed Funds.


## VII.  MIRARCHI'S CONTRACT CLAIM

Mirarchi's lead argument is that he has a contractual right to enforce the contingent fee

provision of the Mirarchi Fee Agreement.  This argument is without merit because it fails to take

---

[33]      I note also that the Debtor's position is inconsistent with her prior conduct in this case.
The Debtor never requested court approval of either Mr. Moldovsky or Mr. McDuffy as special counsel.
Yet, the Debtor supported a request that Mr. Moldovsky receive compensation from property of the
estate.  (See Doc. #'s 29, 71).  Nor did the Trustee object to the Moldovsky compensation request.

into account the Thorpes' discharge of Mirarchi as counsel before the Insurance Litigation

concluded by way of settlement or court judgment.

Certain principles regarding the attorney-client relationship in Pennsylvania are well

established and do not require an extended discussion:

- an implied term of every attorney-client contract is the client's right to discharge the attorney for any or no reason, without penalty;

- when a client exercises this implied contractual right to discharge the attorney, there is no breach of the contract and the attorney has no right to contract damages;

- when a client exercises this right of termination, thereby preventing the attorney from completing performance under the agreement and prior to the occurrence of a contingency set forth in the agreement, the attorney may recovery reasonable compensation for the value of the services provided prior to the termination in the form of a quantum meruit recovery.

See e.g., Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman,

P.C., 137 A.3d 1247, 1258–59 (Pa. 2016); Angino & Rovner v Jeffrey R. Lessin & Associates,

131 A.3d 502, 508-09 (Pa. Super. Ct. 2016); Mager v. Bultena, 797 A.2d 948,

956–57 (Pa. Super. Ct. 2002); accord Novinger v. E.I. DuPont de Nemours & Co., Inc., 809 F.2d

212, 218 (3d Cir. 1987).[34]

In this matter, it is undisputed that the Thorpes never authorized Mirarchi to accept the

---

[34]    The contingent fee agreement in Angino & Rovner provided that if the client terminated the attorney's services, the client would pay or direct the replacement attorney to pay the lawyer 20% of the gross recovery.  In the Pennsylvania Superior Court decision cited in the text, the court held that the contractual termination provision was unenforceable as a penalty on the client for severing the attorney-client relationship that may inhibit the clients ability to engage another attorney.  131 A.3d at 509.

The Pennsylvania Supreme Court granted a petition for allowance of appeal in Angino & Rovner.  138 A.3d 610 (Pa. 2016) The main issues on appeal are whether attorneys are prohibited from including a reasonable fee recovery provision in a contingent fee agreement and whether the equitable remedy of quantum meruit is an attorney's exclusive remedy for recovery for services rendered to former clients.  Id..  Neither of these issues arise in connection with the Mirarchi Fee Agreement.  Therefore, there is no reason to believe that the Pennsylvania Supreme Court will modify any of the legal propositions stated in the text when it renders its decision in  Angino & Rovner.

Nationwide Settlement Offer.  See Proposed Finding of Fact No. 57.  Thus, no funds were generated by "suit or amicable settlement," (Ex. M-13), while Mirarchi represented the Debtors. It follows that the contingency giving rise to Mirarchi's contract claim did not occurr. Therefore, Mirarchi has no enforceable rights under the Mirarchi Fee Agreement.

As the Mager court stated:

> Once the contractual relationship has been severed, any recovery must necessarily be based on the work performed pursuant to the contract up to that point. Where the contingency has not occurred, the fee has not been earned.

Mager, 797 A.2d at 958 (footnote omitted).

In the absence of a right to recover under the Fee Agreement, Mirarchi's sole remaining claim sounds in quantum meruit.

## VIII.  MIRARCHI'S QUANTUM MERUIT CLAIM

### A.  Introduction

The Thorpes contest Mr. Mirarchi's quantum meruit claim, arguing that he forfeited his right to recover due to professional misconduct.  As explained below, I agree that Mr. Mirarchi engaged in professional misconduct.  I also agree, although for reasons slightly different than those articulated by the Thorpes, that Mr. Mirarchi does not have a valid quantum meruit claim and therefore, is not entitled to receive any portion of the Disputed Funds.[35]

---

[35]    The Thorpes frame the issue as involving the application of the equity maxim "he who comes into equity must come with clean hands."  See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 65 S. Ct. 993 (U.S. 1945); Romero v. Allstate Ins. Co., 158 F. Supp. 3d 369, 374–75 (E.D. Pa. 2016); In re Estate of Pedrick, 482 A.2d 215, 223 (Pa. 1984); Stauffer v. Stauffer, 351 A.2d 236, 244–45 (Pa. 1976).  My analysis involves a determination whether Mirarchi may invoke and has a valid quantum meruit claim in the first place, rather than the issue whether, having an otherwise valid quantum meruit claim, Mirarchi is barred from recovery due to his unclean hands.  That said, there may not be much of a practical difference between the two (2) conceptual approaches.

## B.  Mr. Mirarchi's Professional Misconduct

### 1.

Based on its authority under the Pennsylvania Constitution, the Pennsylvania Supreme

Court has adopted the Pennsylvania Rules of Disciplinary Enforcement.  <u>See</u> Pa. R.D.E. 103.

The Court's disciplinary jurisdiction is "exclusive" and applies to various members of the legal

profession, including "any attorney" admitted to practice law in the Commonwealth of

Pennsylvania.  Pa. R.D.E. 201(a)(1).

Several provisions of the Pa. R.D.E. are relevant in this contested matter.

Pa. R.D.E. 102(a) defines the term "administrative suspension" as including the

> Status of an attorney, after Court order, who:  .   .   .   was reported to the Court by
> the Pennsylvania Continuing Legal Education Board under Rule 111(b), Pa.R.
> C.L.E., for having failed to satisfy the requirements of the Pennsylvania Rules for
> Continuing Legal Education .   .   .   .

Pa. R.D.E. 102(a) defines the term "formerly admitted attorney" as including an

"administratively suspended" attorney.

Several subdivisions of Pa. R.D.E. 217 describe the duties of a formerly admitted

attorneys (including those under administrative suspension).  These duties include:

- in the thirty (30) day period between the entry of the order of administrative
  suspension and its effective date, declining all new representation and winding
  up and completing work on pending matters, see Pa. R.D.E. 217(d)(1);

- promptly notifying all clients being represented in pending matters, and the
  attorneys representing the adverse parties, of the administrative suspension
  and "the consequent inability of the formerly admitted attorney to act as an
  attorney after the effective date of the administrative suspension," Pa. R.D.E.
  217(b);

- advising the prompt substitution of another attorney in pending matters, <u>id.</u>;

- ceasing all forms of communication that imply an eligibility to practice law in
  the Pennsylvania courts, Pa. R.D.E. 217(d)(2);

- ceasing the practice of law, except that, under the supervision of a lawyer in
good standing, the formerly admitted lawyer may perform legal work of a
preparatory nature and communicate with clients and third parties regarding
ministerial matters, Pa. R.D.E. 217(j)

## 2.

At trial, Mr. Mirarchi asserted that:

- once he completed his CLE requirements shortly after learning of the
administrative suspension on August 13 or 14, 2015, he had "resolved the
issue," (8/3/16 N.T. at 114);

- upon completing his CLE requirements he was "reinstated," (id.); and

- his reinstatement preceded his settlement negotiations with Nationwide's
attorney,  (id. at 114, 123).

Mr. Mirarchi also introduced a letter from the Pennsylvania Supreme Court Continuing

Legal Education Board ("the CLE Board"), dated August 28, 2015, which certified that Mr.

Mirarchi fulfilled his CLE requirements.  (Ex. M-16).  Mr. Mirarchi then asserted that this letter

from the CLE Board (_N.B._, it is **not** from the Disciplinary Board) confirmed his reinstatement..

(8/19/16 N.T. at 66, 73-74).

Mr. Mirarchi took these positions in his testimony, even though, earlier in the trial he

stipulated that the date of his reinstatement to practice law was September 14, 2015 (with the

proviso that the record would remain open for a brief period of time to permit him to submit any

documentation demonstrating that the actual reinstatement date was different than that in the

stipulation). (8/8/16 N.T. at 10).  Later in the hearing, Mr. Mirarchi finally seemed to concede

that the CLE Board letter of August 28, 2015 did not effect his reinstatement, only to revert to his

initial contentions just a few minutes later.  (Compare 8/19/16 N.T. at 75-78 with id. at 79).  In

the end, Mr. Mirarchi finally resolved any factual uncertainty by producing a letter dated August

22, 2016, from the Registration Office of the Pennsylvania Disciplinary Board, which stated that

Mr. Mirarchi was reinstated on September 16, 2015.  (Ex. M-42).[36]

Mr. Mirarchi's contentions, prior to the hearing as well as at different points during the

hearing in this matter  –  that either the completion of his delinquent CLE credits or the

subsequent August 28, 2015 CLE Board letter constituted his "reinstatement"  –  are indisputably,

legally incorrect.[37]  The fact is, plain and simple, that Mr. Mirarchi was under administrative

suspension from August 14, 2015 to September 16, 2015.[38]  During that period, he should not

have been practicing law, but he continued to do so.  Mr. Mirarchi also violated other duties

under the Pa. R.D.E. by, inter alia, failing to notify the Thorpes, Nationwide's counsel or the C.P.

Court of the suspension. Worse still, it was during the administrative suspension period that he

engaged in critical aspects of the legal representation: negotiating with Nationwide's attorney,

obtaining the Nationwide Settlement Offer and providing legal advice to the Thorpes regarding

the advisability of accepting the settlement offer.

---

[36]    I do not believe Mr. Mirarchi now quarrels with the date in Ex. M-42.  Therefore, I accept September 16, 2015 as the date of his reinstatement rather than the earlier September 14, 2016 date in his oral stipulation.

[37]    Prior to trial of this matter, Mr. Mirarchi represented to the Clerk of the U.S. District Court in a letter dated September 16, 2015 that his suspension was "resolved . . .  immediately upon becoming aware of it."  (See Exs. M-16, M-20).  Mr. Mirarchi repeated the gist of these  false statements in a later letter to the Thorpes dated December 3, 2015, in which he stated: "Any issue as my license being active in late August 2015, **were resolved near immediately** upon my notification."  (Ex. M-32).

His suspension exceeded thirty (30) days.  That cannot fairly be characterized as having been resolved "near immediately."

[38]    Mr. Mirarchi's stubborn insistence that he was not disabled from practicing law while under administrative suspension in August 2015 demonstrates a disturbing lack of understanding of his professional obligations under the Pa. R.D.E..

On some level, Mr. Mirarchi's desire to ignore his suspended status is understandable. He was placed under administrative suspension for the relatively innocuous failure to maintain his CLE obligations, (relatively innocuous, compared to other types of more serious and culpable conduct that may result in suspension or disbarment, such as mishandling client's property or failing to represent clients competently).  He then addressed the CLE problem immediately, by taking the required CLE courses.  From a subjective standpoint, I presume that Mr. Mirarchi's experience of these events was relatively seamless.  He likely felt no different, no less competent and no less able to practice law on August 14, 2015 when his suspension took effect and no more competent and no more able to practice law a few days later after he completed his CLE requirements.  He also may have understood that the formal reinstatement of his law license was likely to be a relatively ministerial process with the Disciplinary Board and the Supreme Court.

The considerations described above may have caused Mr. Mirarchi to convince himself that a "technicality" should not interfere with his professional life and that he should be able to continue with "business as usual" in his law practice once he completed his CLE obligations.  All of this is understandable on a human, emotional level.  But that is not what the law required and, as an attorney, Mr. Mirarchi should have had an enhanced sensitivity to his professional obligations.  His likely subjective experience of the administrative suspension provides no excuse for his failure to fulfill his professional obligations to comply with the express requirements of the Pa. R.D.E..

The question, then, is not whether Mr. Mirarchi committed professional misconduct, but rather, the effect of that misconduct on his right to recover a portion of the Disputed Funds under the quantum meruit doctrine.

-40-

## C. <u>Quantum Meruit</u>: Applicable Legal  Principles and Case Law

### 1.

The doctrine of <u>quantum meruit</u> "is a quasi-contractual remedy in which a contract is

implied-in-law under a theory of unjust enrichment."  <u>Hershey Foods Corp. v. Ralph Chapek,</u>

<u>Inc.</u>, 828 F.2d 989, 998 (3d Cir. 1987); <u>Philadelphia Hous. Auth. v. CedarCrestone, Inc.</u>, 562 F.

Supp. 2d 653, 655 n.3 (E.D. Pa. 2008).  As such, it is an equitable doctrine.  <u>See, e.g.</u>, <u>Knox v.</u>

<u>Herman Gerel, LLP</u>, 2014 WL 2880277, at *20 (E.D. Pa. June 24, 2014); <u>Bednar v. Marino</u>, 646

A.2d 573, 578 (Pa. Super. Ct. 1994); <u>see also</u> <u>Kelly v. Vennare</u>, 2016 WL 106218, at *10 (Pa.

Super. Ct. Mar. 16, 2016) (nonprecedential).  When applicable, <u>quantum meruit</u> "measures

compensation  . . .  as [the] reasonable value of services rendered."  <u>Angino & Rovner</u>, 131 A.3d

at 508.  The determination of the amount of reasonable compensation is committed to the

discretion of the court.  <u>See</u> <u>Mager</u>, 797 A.2d at 961 (quoting <u>Robbins v. Weinstein</u>, 17 A.3d

629, 633 (Pa. Super. Ct. 1941)).

### 2.

There is a small body of case law that addresses the right of an attorney to recover in

<u>quantum meruit</u> after termination of a contingent fee agreement.

As stated in Part VII, <u>supra</u>, when a client exercises the implied right to terminate the

attorney-client contract for any reason, thereby preventing an attorney from completing

performance under the contract, an attorney may recover the value of the services previously

rendered in <u>quantum meruit</u>.  A logical corollary to this principle is that an attorney whose

contract with a client is terminated on grounds other than the implied right to discharge counsel

(e.g., due to a material breach of the attorney's contractual duties to the client), the attorney has

no right to recover at all.

In Lampl v. Latkanich, 231 A.2d 890, 894 (Pa. Super. Ct. 1967), the court stated that "an

attorney is entitled to no compensation whatever, if he is discharged because of his own wrongful

acts." The Lampl court, however, did not explain what it meant by "wrongful." The quantum

meruit doctrine generally is not designed to aid parties who have committed material contract

breaches. Presumably, then, consistent with the purposes of quantum meruit, "wrongfulness"

includes any conduct that constitutes a material breach of an attorney's duties to the client.

See Joseph M. Perillo, The Law of Lawyers' Contracts Is Different, 67 Fordham L. Rev. 443,

448–49 (1998).

The next question is whether a suspension of an attorney's law license, which precludes

the attorney from rendering service under the attorney-client contract, constitutes a material

breach for quantum meruit purposes. Two (2) district court opinions in this district, subsequent

to Lampl, have addressed this question. See Pearson v. Tanner, 870 F. Supp. 2d 380, 384–85

(E.D. Pa. 2012), aff'd, 513 F. App'x 152 (3d Cir. 2013); Eisenberg v. Gen. Motors Acceptance

Corp., 761 F. Supp. 20, 22 (E.D. Pa. 1991).[39] Both opinions observed that courts nationwide

have divided between two approaches to the issue.

The first line of cases equates the attorney's suspension or disbarment to a material

breach of the attorney-client contract. Recovery in quantum meruit (quasi-contract) is barred in

---

[39]     There is a third reported district court opinion, Feingold v. Graff, 2012 WL 2400998
(E.D. Pa. June 26, 2012). Without an extended discussion, the Graff court followed Pearson, finding its
reasoning persuasive.

such cases because the attorney's suspension is treated as a voluntary withdrawal and

abandonment of the client caused by the attorney's own wrongful conduct (i.e., whatever

wrongful conduct resulted in the suspension).

The second line of cases permits quantum meruit recovery for services rendered pursuant

to a contingency fee arrangement prior to suspension or disbarment where the attorney discipline

was unrelated to the particular matter for which recovery was sought.  These cases reason that it

is unfair to deprive the attorney of compensation for services rendered because it would unjustly

enrich the former client – provided that the reasons for the suspension were unrelated to the

representation of the former client. Stated slightly differently, the second approach treats an

attorney's suspension or disbarment not as voluntary abandonment, but, rather, as an automatic

termination of the attorney-client relationship by operation of law, akin to incapacitation from

illness or death, which, under the theory of impossibility, or frustration of contractual purpose,

excuses nonperformance and allows recovery for partial performance.[40]

Pearson and Eisenberg reached opposite results, with Pearson following the first approach

and denying the attorney's quantum meruit claim while Eisenberg followed the second approach

and granting the claim.

### D.  The Thorpes's Discharge of Mirarchi for Wrongful Conduct Precludes Mirarchi's Recovery in Quantum Meruit

In Pearson, the Court of Appeals affirmed the district court's denial of the attorney's

quantum meruit claim on the ground that the attorney seeking payment could not satisfy the

---

[40]      These principles discussed above may be extracted from the opinions in Pearson, 870 F.
Supp. 2d at 384 and Eisenberg, 761 F. Supp. at 22–23.

requirements under either of the two (2) lines of cases and therefore, found it unnecessary to

choose between the competing lines of cases.   See 513 F. App'x at 156.  I, too find it

unnecessary to choose between the two (2) lines of cases; neither supplies the appropriate rule of

decision due to the particular factual circumstances in this case.

The facts of this case differ materially from the "attorney suspension" cases exemplified

by Pearson and Eisenberg.  In those cases, the attorney-client contractual relationship was

severed by the apparently simultaneous suspension of the attorney and the attorney's withdrawal

from the representation of the client.  In this case, Mr. Mirarchi did not withdraw from the

representation while under suspension, his right to practice law was reinstated within

approximately thirty (30) days and it was not until several months later that he was discharged by

the Thorpes.  The point here is that the Thorpes-Mirarchi attorney-client relationship was severed

irrevocably not by the administrative suspension, but rather, by the Thorpes' discharge of

Mirarchi in November or December 2015.[41]

Thus, the material issue here is whether the Thorpes' active, express termination of the

attorney-client relationship was based on Mirarchi's wrongful conduct or whether it was merely

the exercise of the implied contractual right to discharge an attorney for any reason (or no

reason).  If the former, under Lampl, Mirarchi may not recover in quantum meruit; if the latter,

perhaps he could.[42]

---

[41]      By comparison, had Mr. Mirarchi withdrawn from the representation in August 2015
when his administrative suspension took effect and been replaced, at that time, by new counsel who then
completed a settlement of the Insurance Litigation, Mr. Mirarchi's request for a quantum meruit recovery
would present the same issue that divided the Pearson and Eisenberg courts.

[42]      To illustrate the distinction being drawn, consider the following hypothetical.

(continued...)

-44-

I conclude that the Thorpes' termination of Mr. Mirarchi in November or December 2015 was based on his wrongful conduct.  By that time, the Thorpes had discovered that Mr. Mirarchi had been administratively suspended, that he had not timely notified them of the suspension and that he had continued to practice law and represent them while suspended. Also, he had been uncooperative in his responses to the Thorpes' request for specific details regarding the duration of the suspension.  Indeed, he provided them with information regarding his professional status that was misleading, if not an outright misrepresentation.  See Proposed Finding of Fact Nos. 51-54 & nn.20, 21, 37, supra.  Under Lampl, this conduct, which led to Mr. Mirarchi's discharge as counsel, constitutes the type of "wrongful act" that bars all recovery by a discharged attorney.[43]

---

[42](...continued)

Assume that Mr. Mirarchi notified the Thorpes of his administrative suspension and had otherwise complied with his obligations under the Pa. R.D.E.  Assume further, however, that upon his reinstatement, the Thorpes ratified or re-entered the Mirarchi Fee Agreement, after which Mr. Mirarchi, able to practice law again, negotiated the settlement terms with Nationwide's counsel.  Finally, assume that only after the negotiation of the terms of the eventual settlement did the Thorpes discharge Mr. Mirarchi's as counsel, for reasons other than wrongful conduct.  In this scenario, arguably Mirarchi's right to recover in quantum meruit would be quite strong.

Of course, these facts differ from the real facts in this case in that there was no de facto interruption of the attorney-client relationship during the administrative suspension, as there should have been, and Mr. Mirarchi negotiated the Nationwide Settlement Offer while under administrative suspension.  The point here is that if the later (November or December 2015) discharge of Mirarchi was for cause based on Mr. Mirarchi's wrongful conduct, consideration of the effect of the administrative suspension on Mr. Mirarchi's quantum meruit rights is unnecessary.

[43]    The Thorpes grounded their legal argument on the venerable maxim employed in equitable proceedings: "he who comes into equity must come with clean hands."  The U.S. Supreme Court has described the unclean hands doctrine as:

> a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 65 S.Ct. 993 (U.S. 1945).

(continued...)

## IX. CONCLUSION

In the end, this is an equity case.  Mirarchi has no contract rights against the Thorpes He seeks equitable relief because denial of all compensation for the services he rendered to the Thorpes while he was duly licensed to practice law undoubtedly results in a windfall to the Thorpes.  Hence, he invokes the doctrine of <u>quantum meruit</u>, which itself is rooted in the doctrine of unjust enrichment.  <u>Quantum meruit</u> is designed to permit an attorney in Mr. Mirarchi's position to recover the fair value of the services he provided.  However, the case law discussed above emphasizes that the an attorney's equitable rights available under the <u>quantum meruit</u> doctrine are forfeited if the attorney's is sufficiently wrongful.  Due to his wrongful conduct – his failure to notify the Thorpes of his administrative suspension, his conduct in continuing to represent them and practice law without a valid law license and his lack of cooperation and dissembling when the Thorpes sought to learn the details of the administrative suspension after his practicing privileges were restored  –  Mr. Mirarchi has forfeited his <u>quantum meruit</u> rights.

---

[43](...continued)

In <u>Romero v. Allstate Ins. Co.</u>, 158 F. Supp. 3d 369, 374–75 (E.D. Pa. 2016), the court explained the doctrine applies to bar relief when:

> (1) a party seeking affirmative relief;

> (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith;

> (3) directly related to the matter in issue;

> (4) that injures the other party; and

> (5) affects the balance of equities between the litigants.

<u>Romero</u> and other courts have emphasized that the doctrine applies only if the unconscionable conduct is directly connected to the subject of the litigation between the parties.  Id. at 376; <u>accord In re Estate of Pedrick</u>, 482 A.2d 215, 223 (Pa. 1984); <u>Stauffer v. Stauffer</u>, 351 A.2d 236, 244–45 (Pa. 1976); <u>In re Bosley</u>, 26 A.3d 1104, 1114 (Pa. Super. Ct. 2011).

For these reasons, I recommend that the district court enter an order denying the

Mirarchi Motion.

**Date:  February 17, 2017**
                                                        _____
                                                        **ERIC L. FRANK**
                                                        **CHIEF U.S. BANKRUPTCY JUDGE**