## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 12 |
| | : | |
| **RENEE M. THORPE,** | : | |
| | : | |
| Debtor | : | **Bky. No. 13-15267 ELF** |

# M E M O R A N D U M

## I.  INTRODUCTION

On June 22, 2016, Joseph Q. Mirarchi Legal Services, P.C. ("MLS"), a law firm in which Joseph Q. Mirarchi ("Mirarchi") was the sole practitioner, filed a motion ("the Motion") ("Doc. 581") seeking payment of $113,400.00 that has been placed in the bankruptcy court clerk's registry ("the Escrowed Funds").  The Escrowed Funds constitute thirty-five percent (35%) of the settlement proceeds of a state court lawsuit ("the C.P. Action") that the chapter 12 debtor, Renee M. Thorpe ("the Debtor"), and her non-debtor husband, Dale Thorpe (collectively, "the Thorpes"), filed against Nationwide Mutual Insurance Company ("Nationwide").

Presently, the Motion is before the bankruptcy court on remand from the Court of Appeals and the district court. The district court instructed this court to make a recommendation concerning the proper amount of a <u>quantum meruit</u> award to MLS.  (<u>See</u> Doc. # 695).

For the reasons set forth below, I recommend that the district court enter an order determining that MLS is entitled to $25,200.00 and that the Thorpes are entitled to the $88,200.00 balance of the Escrowed Funds**.**

## II.  PROCEDURAL HISTORY

### A.  Prior to the District Court Remand

The initial procedural history of this matter is set forth in detail in this court's

Memorandum dated February 17, 2017.  See In re Thorpe, 563 B.R. 576, 580-83 (Bankr. E.D.

Pa. 2017) ("Thorpe I"), recommendation adopted sub nom., U.S. Trustee v. Thorpe, 2017 WL

3084388 (E.D. Pa. July 20, 2017) ("Thorpe II"); aff'd in part, rev'd in part sub nom., In re

Thorpe, 755 F. App'x 177 (3d Cir. Nov. 20, 2018) (nonprecedential) ("Thorpe III").  So, I will

limit the discussion to a brief description of my initial Memorandum and the procedural events

that followed.

In Thorpe I, after determining that the dispute was a non-core matter, see 563 B.R. at

594–97, I issued proposed findings of fact, proposed conclusions of law and a recommendation

that the district court deny the Motion in its entirety.  I concluded that MLS lacked any right to

the Escrowed Funds based on the contingency fee contract between MLS and the Thorpes.  I

further concluded that Mirarchi's professional misconduct precluded any recovery in quantum

meruit.

By Memorandum and Order entered on July 20, 2017, the district court adopted this

court's recommendation and denied the Motion.  Thorpe II.

On November 20, 2018, the Court of Appeals affirmed the district court's order in part,

reversed it in part, and remanded the matter to the district court.

The Court of Appeals affirmed the district court's determination that MLS lacked a

contractual right to the Escrowed Funds based on the contingency fee agreement.  Thorpe III, 755

F. App'x at 180.  The Court of Appeals reversed the district court's determination that, due to

wrongful conduct, MLS was precluded from a recovery in <u>quantum meruit</u>, reasoning:

> [W]e hold that the doctrine of unclean hands does not bar the quantum meruit claim of Mirarchi. We acknowledge that he was placed on administrative suspension due to his own failure, although seemingly negligent, to obtain the requisite CLE credits to continue practicing law in Pennsylvania. We also acknowledge that Mirarchi's failure to disclose his administrative suspension violated the Pennsylvania Rules of Disciplinary Enforcement, see Pa. R.D.E. 217(b), and that his work on behalf of the Thorpes during his one-month administrative suspension constituted the unauthorized practice of law, <u>see</u> 42 Pa. C.S.A. § 2524; Pa. R.D.E. 217(j). We do not applaud the manner in which Mirarchi handled his representation of the Thorpes once he was placed on administrative suspension. Nonetheless, we do not believe his conduct shocks the conscience such that he should be completely denied recovery based on the doctrine of unclean hands.

<u>Id.</u> at 182.

The Court of Appeals remanded the matter "to the Bankruptcy Court and the District Court to determine in the first instance the proper amount of Mirarchi's recovery in <u>quantum meruit</u>." <u>Id.</u> at 183 (footnote omitted).[1]

---

[1]    The Court of Appeals also "le[ft] to the courts the question—which is suggested but not presented by the record on this appeal  —  of whether Mirarchi's claim of <u>quantum meruit</u> is properly asserted against the Thorpes or instead must be brought against their subsequent attorney after that attorney is paid."

<u>Thorpe III</u>, 755 F. App'x at 183 (citation omitted).

I recommend that the district court treat this question as a non-issue.

The Thorpes' fee arrangement with their subsequent attorney, Herbert McDuffy, Jr. ("McDuffy"), entitles McDuffy to receive one-third (1/3) of whatever amounts the Thorpes recover  from the settlement of the Nationwide litigation.  (August 19, 2016 Transcript at 29; Ex. D-2).  This arrangement excludes from the calculation the  payment from the Escrowed Funds that already has been made to Lititz Properties, LLC pursuant to a court-approved settlement.  Thus, the Thorpes' recovery will be limited to whatever amount of the Escrowed Funds is left after MLS's <u>quantum meruit</u> entitlement is determined.  To the extent that the Thorpes prevail, McDuffy is entitled to one-third of that amount.

In effect, McDuffy has delegated to the Thorpes the task of litigating with MLS the competing claims to the Escrowed Funds. If the Thorpes prevail, they are obliged to pay him in

(continued...)

Following the remand to the district court, by order entered December 17, 2018, the

district court "referred" the matter to this court "to determine the proper amount of [the] quantum

meruit award."  See (Doc. # 695).


### B.  After the District Court Remand

### 1.  overview

On December 20, 2018, this court entered an order requiring:

> **on or before** January 4, 2019, each party shall file a statement stating whether this
> court may comply with the requirements of the remand order based on the existing
> evidentiary record or whether it is necessary and/or appropriate for this court to
> take further evidence on the issue. If a party asserts that further evidence is
> necessary and/or appropriate, the party [must] state with specificity the reasons for
> its position.

(Doc. # 696) (emphasis in original).

No party in interest filed a timely request for the opportunity to supplement the existing

evidentiary record.

On March 18, 2019, after determining that additional briefing "would be of assistance to

the court," I entered another order, this time directing that each party submit a memorandum on

or before April 9, 2019.  (Doc. # 706).

The March 18, 2019 order was specific in describing the issues to be addressed in the

requested memoranda:

---

[1](...continued)
accordance with the fee agreement they made with McDuffy.   Furthermore, McDuffy is well aware of
this litigation, having testified in this case, but has made no effort to intervene.  Belatedly, McDuffy filed
a memorandum of law (to be discussed again in Part II.B, infra), but at no time has he contended that he
is entitled to a determination that any portion of the Escrowed Funds are payable directly to him.

    (a) the appropriate legal standards to be applied in determining a <u>quantum meruit</u> award in a case in which an attorney's services have been terminated before the right to a contingent fee has vested; and

    (b) the proper determination of the <u>quantum meruit</u> award based on the facts of this case, with citations to the record (or to the prior findings [of] fact of the district court or the proposed findings of fact of the bankruptcy court) for any facts employed in the analysis.

(<u>Id.</u>).

As the March 18, 2019 Order indicated on its face, I directed the filing of additional submissions from the parties to flesh out their positions regarding the applicable legal standards and to have them point to the relevant facts in the existing record (with citations to the record) that should be considered in determining MLS's <u>quantum meruit</u> entitlement.

Unfortunately, the March 18, 2019 Order triggered a flurry of filings from the parties that went well beyond the scope of the submissions ordered by the court – a veritable free-for-all of unsolicited, sometimes untimely, filings and responses. I address those matters below.

## 2.  the Thorpe's Judicial Notice Motion

### a.

On April 9, 2019, the Thorpes filed a motion, ("the Judicial Notice Motion") (Doc. # 708), requesting that this court take judicial notice of the Pennsylvania Supreme Court's March 18, 2019 Order ("the Supreme Court Order").  The Supreme Court Order disbarred Mirarchi based on an accompanying Report and Recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania..  The Thorpes also attached to the Judicial Notice Motion a copy of the seventy-three (73) page report of the Disciplinary Board. ("the Report").

The Thorpes contend that Mirarchi's disbarment is relevant evidence that was not available before the expiration of the January 4, 2019 deadline set by this court for requesting the opportunity to supplement the existing record.

MLS objects to the court's consideration of this additional evidence on the ground that the Thorpes are requesting that the court take judicial notice of facts that are in dispute (without explaining why the facts of the disbarment and the findings in the Report are in dispute).  (Doc. # 718).

I will deny the Judicial Notice Motion, but for reasons other than those offered by MLS.  I conclude that the Supreme Court Order and the Report provide evidence that is either merely cumulative or irrelevant.

**b.**

The Report describes numerous instances of professional misconduct by Mirarchi involving, inter alia: (a) the handling and misappropriation of client trust fund monies and (b) the unauthorized practice of law while under administrative suspension.  The Report makes no specific reference to any conduct involving Mirarchi's representation of the Thorpes.

The Report does reference the July 15, 2015 Pennsylvania Supreme Court order (effective on August 14, 2015) that administratively suspended Mirarchi for failing to comply with his continuing education requirements, as well as his reinstatement effective September 16, 2015. (Report ¶¶ 161-62, 185).  The Report then states the Disciplinary Board's finding that between August 14, 2015 and September 15, 2015, Mirarchi "continued to maintain an office for the practice of law and to hold himself out as eligible to practice law" and "falsely testified at the

disciplinary hearing that while he was administratively suspended, he 'did not work on any cases.'" (Id. ¶¶ 180, 186).

With the possible exception of the Report's reference to the unauthorized practice of law, none of the other, numerous instances of misconduct recited in the Report relate to Mirarchi's representation of the Thorpes. It is not possible to tell from the Report whether the Thorpes' case was one of the cases the Disciplinary Board was referring to when it found that Mirarchi worked on cases while under administrative suspension in 2015. But, ultimately, that is of no consequence. The fact that Mirarchi practiced law by representing the Thorpes while under administrative suspension in 2015 is not "news" to this court. That fact was established during the initial hearing in this court and is no longer in dispute. See Thorpe I, 563 B.R. at 586-88, 601-02; see also Thorpe III, 755 F. App'x at 179 ("While suspended, Mirarchi negotiated on behalf of the Thorpes a settlement with Nationwide for $324,000").

As for the Pennsylvania Supreme Court Order, it merely constitutes an administrative action taken by the Court in 2019, years after the events giving rise to the dispute. It is irrelevant.

Consideration of the additional evidence requested by the Thorpes will not affect the quantum meruit determination. Therefore, I will deny the Judicial Notice Motion.


### 3. the Mirarchi time records and other evidentiary matter

#### a.

On April 9, 2019, MLS also filed its submission in response to the court's March 19, 2019 Order, which it styled as "Memorandum of Law of Movant Mirarchi Legal Services, P.C.

***Serving to Supplement the Record*** in Connection with the Third Circuit Court of Appeals

Mandate and Remand of the Motion for Payment of Certain Funds Held in Escrow."  (Doc. #

713) (emphasis added).

As suggested by its title, MLS attached to the memorandum various documents that

contain evidentiary matter not in the present evidentiary record:

- a "File Activity Log" that purports to be a record of the time Mirarchi expended and costs incurred in this matter from November 20, 2014 through December 12, 2018;

- documents that appear to verify expenses incurred by MLS in connection with the Third Circuit Appeal;

- an itemization of the invoices MLS received from Fox Rothschild LLP ("Fox Rothschild"), the law firm that represented MLS during the course of <u>Thorpe I</u>, and

- copies of Fox Rothschild's state court complaint for unpaid legal fees ("the C.P. Action") and MLS's answer and counterclaim to that complaint.[2]

In the File Activity Log, MLS asserts that Mirarchi spent 326.30 hours in connection with

this matter, for a total legal fee of $97,890.00 on a lodestar basis.  In addition, MLS lists

expenses incurred of $505.00 for filing in the Court of Appeals, $16,916.92 in appellate printing

costs and $57,669.19 in legal fees owed to Fox Rothschild.[3]  The File Activity Log concludes by

stating that the "Grand Total Quantum Meruit Claim" is $172,981.11, an amount that far exceeds

---

[2]     MLS also attached copies of the Court of Appeals opinion and docket.  These documents
are unnecessary, but innocuous.

[3]     MLS makes no effort to square the reimbursement request for legal fees due to Fox
Rothschild with its position in the C.P. Action that it owes Fox Rothschild nothing and that, in fact, Fox
Rothschild owes MLS $9,581.89.

the $113,400.00 in Escrowed Funds.[4]

## b.

The Thorpes object to the court's consideration of the additional evidence. I agree that this evidence should not be considered in fixing the amount of MLS's <u>quantum meruit</u> entitlement.

There are two (2) threshold problems with consideration of the documents attached to MLS's memorandum: (1) the evidence is unverified and (2) their submission as an attachment to the memorandum deprives the Thorpes of the opportunity to cross examine Mirarchi on the content of the documents – in particular, the File Activity Log.

---

[4]      In certain respects, the content of the File Activity Log is astounding.

During the time period in which MLS served as the Thorpes' counsel before they terminated the attorney-client relationship (and excluding the period of Mirarchi's administrative suspension) – <u>i.e.</u>, from November 20, 2014 to August 14, 2015 and September 16, 2015 to November 12, 2018 – the File Activity Log reflects that Mirarchi claims to have expended approximately 120 hours in providing legal services to the Thorpes. Assuming <u>arguendo</u> that these time records are accurate and that the services were appropriate and provided a benefit to Thorpes (and, further, that Mirarchi's proffered hourly rate of $300.00 is reasonable), this suggests that, based on a lodestar analysis, <u>see</u> Part IV.A, <u>infra</u>, MLS's quantum meruit entitlement would be approximately $36,000.00.

The remaining amounts claimed by MLS, an additional $136,981.11 (an almost four-fold increase in the asserted <u>quantum meruit</u> claim) are based either on time personally expended by Mirarchi in pursuing his <u>quantum meruit</u> claim **after his termination as counsel by the Thorpes** or are legal expenses incurred by MLS in retaining outside counsel (Fox Rothschild) to pursue the <u>quantum meruit</u> claim.

MLS does not offer any explanation or colorable legal basis for including these additional amounts in its <u>quantum meruit</u> request. The time spent by Mirarchi after his termination by the Thorpes, by definition, falls outside of the <u>quantum meruit</u> doctrine, whose purpose is to compensate a discharged attorney for the value of the services provided prior to the termination of the attorney-client relationship.

As for the amount incurred by MLS in retaining Fox Rothschild, this expense was not incurred in connection with the C.P. Action, but rather in the <u>de facto</u>, separate "collection" proceeding in this court in which the Thorpes and MLS made competing claims to the Escrowed Funds. MLS offers no authority to support a departure from the "American Rule," in which each party bears its own legal expenses in the absence of a contractual or statutory fee-shifting provision. <u>See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240 (1975).

But most importantly, and decisively, MLS' submission is untimely in light of the January 4, 2019 deadline set by the court's December 20, 2018 order.

By failing to respond to the December 20, 2018 order, the parties bound themselves to the record established during the course of Thorpe I. The March 18, 2019 order (the second post-remand order entered by this court) did not alter the December 20, 2018 order. It merely requested and authorized the filing of memoranda on specified issues; it did not reopen the evidentiary record or authorize MLS to submit additional evidence by attaching documents to its memorandum.

If MLS wished, belatedly, to supplement the record, the only proper course would have been to file a motion to extend the January 4, 2019 deadline and for leave to supplement the evidentiary record. Had such a motion been filed, and granted, MLS could have offered its additional evidence at a hearing, subject to the Thorpes' cross-examination and potential rebuttal evidence.

Instead, MLS simply ignored the January 4, 2019 deadline set by the court and, more than two (2) months after the deadline expired, submitted additional evidence – without offering any explanation or excuse for its delay. This was improper because evidence may not be submitted to the court by attaching material to a post-hearing brief[5] and because the submission was untimely.[6]

_____

[5]    See In re Atlantic Med. Mgmt. Servs., Inc., 387 B.R. 654, 657 n. 1 (Bankr. E.D. Pa. 2008); accord In re Bennett, 528 B.R. 273, 275 n.2 (Bankr. E.D. Pa. 2015).

[6]    See Fed. R. Bankr. P. 9006(b) (a request for enlargement of time set by court order made after expiration of the deadline requires the filing of a motion and a showing of excusable neglect); see generally Salisbury v. Town of Watertown, 82 F.R.D. 403, 404 (D. Conn. 1979) (dates fixed by court order "are not empty formalities. To neglect and ignore a date for action in a court proceeding is in

(continued...)

-10-

In these circumstances, it is appropriate to enforce the January 4, 2019 deadline set by the December 20, 2018 order and disregard the exhibits attached to MLS's memorandum.  See U.S. v. Locke, 471 U.S. 84, 101 (1985) ("if the concept of a filing deadline is to have any content, the deadline must be enforced"); accord Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir. 2003) ("the legal system would groan under the weight of a regimen of uncertainty in which time limitations were not rigorously enforced — where every missed deadline was the occasion for the embarkation on extensive trial and appellate litigation to determine the equities of enforcing the bar"); Rockwell Automation, Inc. v. U.S., 7 F. Supp. 3d 1278, 1303 (Ct. Int'l Trade 2014) (deadlines in court orders "must mean something" and "must be respected and honored by the parties and they must be enforced by the court, unless, of course, they are extended pursuant to a timely-filed motion").

Therefore, my recommendation regarding MLS's quantum meruit entitlement will be based entirely on the record made at the hearings held in the course of Thorpe I.

---

[6](...continued)
reality a thinly-veiled species of disrespect . . . for the Court").

### III.  PROPOSED FINDINGS OF FACT

I incorporate by reference all of the Proposed Findings of Fact set forth in my prior

Memorandum,[7] with the exception of Proposed Finding of Fact No. 57.[8]  See Thorpe I, 563 B.R.

576, 583–90.

I supplement the prior Proposed Findings of Fact with the Following Supplemental

Proposed Findings of Fact::

1.  From November 20, 2014 through November 23, 2015, MLS expended 22
    hours in representing the Thorpes in the C.P. Action.

2.  The $300.00 hourly rate requested by MLS for the services provided by
    Mirarchi is reasonable.[9]

The first Supplemental Proposed Finding of Fact warrants some further explanation.

During the course of the hearing preceding Thorpe I, MLS's primary legal theory was that

---

[7]      While it perhaps goes without saying, in fulfilling the remand mandate in this non-core,
contested matter, I must again submit proposed findings of fact and conclusions of law to the district
court.

[8]      Proposed Finding of Fact No. 57 stated: "The Thorpes' discharge of Mr. Mirarchi as
counsel was based, in significant part, on his administrative suspension, his failure to advise them of the
suspension and what they considered to be his inadequate responses to their inquiries regarding the
suspension."  Thorpe I, 563 B.R. at 589 (footnote omitted).

> The Court of Appeals appears to have found the facts otherwise:
>
> > It appears to us that the Thorpes' claim of interest in Mirarchi's continuing legal
> > education may have been motivated by the significant sum they stood to gain by
> > using his administrative suspension to deny his agreed fees

Thorpe III, 755 F. App'x at 181 n.2.

[9]      At the time he undertook the representation of the Thorpes, Mirarchi had been practicing
law for almost thirteen (13) years, (8/3/16 N.T. at 13-14) and appeared to have considerable civil
litigation experience.   The Thorpes have not expressed vigorous opposition to the requested hourly rate;
they appear to suggest only that it is at the upper end of the possible range of a reasonableness.  (See
Thorpes' Memorandum at 29) (unpaginated).

it was entitled to recover the Escrowed Funds as a matter of contract based on its contingent fee agreement with the Thorpes.  Truly, quantum meruit was an afterthought.  Consequently, there is very little in the record regarding the amount of time MLS expended in representing the Thorpes in the C.P. Action.

Initially, Mirarchi stated that he did not keep time records while he represented the Thorpes.  (8/3/16 N.T. at 74).[10]  When pressed further on the amount of time MLS spent in representing the Thorpes, the most concrete testimony on the subject occurred in the following exchange between Mirarchi and the Thorpes' attorney:

> Q:  So, Mr. Mirarchi, as I understand it and I don't have the pleading in front of me, but my recollection is, is that you have two figures, eight hours and 13 hours at different parts in your pleading, is that correct?

> A:  If I indicated that, that was my representations and they were correct, yes.

(8/3/16 N.T. at 78).

There is nothing else in the record quantifying the amount of time MLS spent in representing the Thorpes between November 20, 2014 and August 14, 2015 and from September 16, 2015 to November 23, 2015.[11]

The pleading referenced in the above-quoted exchange between Mirarchi and the Thorpes' attorney is the *Nunc Pro Tunc* Application to Employ Joseph Q. Mirarchi Legal

---

[10]    Based on this testimony, the File Activity Log that MLS attempted to place into the record necessarily must be time records that were reconstructed more than three (3) years after MLS's representation of the Thorpes concluded.

[11]    The paucity of the record was the reason I entered the December 20, 2018 order regarding possible supplementation of the record.  As discussed in Part II.B., supra. MLS did not timely avail itself of the opportunity to provide additional evidence regarding the time it spent representing the Thorpes.

Services, P.C. as Special Litigation Counsel ("the Application to Employ") (Doc. # 545).[12]  In the Application to Employ, MLS represented that in the weeks following its retention (accomplished by an exchange of text messages between Dale Thorpe and Mirarchi on December 22, 2014), MLS thereafter "worked on the matter for approximately thirteen (13) hours."  (Application to Employ ¶¶ 24, 28).  The Application to Employ also stated that, in the weeks following February 17, 2015, MLS expended "at least eight (8) hours revising certain pleadings in the State Court Action.  (Id. ¶ 36).

The record supports a finding that MLS spent twenty-one (21) hours representing the Thorpes.[13]  In their remand memorandum, the Thorpes rounded that number up to twenty-two (22) hours.  (Thorpes' Memorandum at 11-12) (unpaginated).  I accept the Thorpes' calculation.

---

[12]        MLS filed the Application to Employ on April 15, 2016.  At that time, the motion seeking approval of the settlement between the Thorpes and Nationwide in the C.P. Action was pending, the settlement proceeds had not yet been paid.  MLS objected to the settlement and also filed the Application to Employ in an effort to obtain payment of its claimed contingent fee.  Subsequently, I denied the Application to Employ, approved the settlement without prejudice to MLS's claim to the contingent fee and ordered the contingent fee amount to be held in escrow by the court clerk (thereby creating the Escrowed Funds).  (See Doc. # 571).

[13]        Basing a finding of the time expended by MLS by reference to the two (2) time periods stated in the Application to Employ dovetails with Mirarchi's testimony and my prior proposed findings of fact.  At trial, Mirarchi explained that once the pleadings in the C.P. Action closed, little or no work was done to further the litigation (e.g., discovery) until August 25, 2015, when the settlement discussions commenced. See Thorpe I, 563 B.R. at 586 & n.14 (Proposed Findings of Fact Nos. 29-32).  Of course, by that later date, Mirarchi was under administrative suspension.

## IV.  DISCUSSION

### A.  Applicable Legal Principles

In Thorpe III, the Court of Appeals determined that MLS "has a viable quantum meruit claim of at least some amount." 755 F. App'x at 183.  That is the starting point in my analysis.[14]

An action in quantum meruit "sounds in quasi-contract or contract implied in law and seeks the equitable remedy of restitution where one person has been unjustly enriched by the services of another."  Thorpe III, 755 F. App'x at 181 (quoting Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1250 n.4 (Pa. 2016)).[15]

At its core, quantum meruit is equitable in nature.  See, e.g., Knox v. Herman Gerel, LLP, 2014 WL 2880277, at *20 (E.D. Pa. June 24, 2014); Bednar v. Marino, 646 A.2d 573, 578 (Pa.

---

[14]    "It is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir. 1985); accord CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499 F.3d 184, 197 (3d Cir. 2007); Laborers' Int'l Union of N. Am. AFL-CIO v. Foster Wheeler Energy Corp., 26 F.3d 375, 397 (3d Cir. 1994). This axiom is referred to as "the mandate rule."

[15]    MLS's quantum meruit claim arises from the termination of its contingent fee agreement with the Thorpes.  The contingent fee agreement provided that MLS was entitled to receive thirty-five percent (35%) of any recovery in the C.P. Action and the Thorpes' termination of the attorney-client relationship prior to any recovery in the lawsuit.  See Thorpe I, 563 B.R. at 585-86, 590 (Finding of Fact Nos. 26-27 and 58-62).

As the Pennsylvania Superior Court has explained:

> Upon a client's termination of an attorney-client relationship prior to the occurrence of the contingency set forth in a fee agreement, the client is not relieved of his or her obligation to compensate the attorney for services rendered until the time of termination. In such situations, the terminated attorney generally has a claim in quantum meruit to recover his fees.

Angino & Rovner v. Jeffrey R. Lessin & Assocs., 131 A.3d 502, 508 (Pa. Super. Ct. 2016) (emphasis and citations omitted).

Super. Ct. 1994); see also Kelly v. Vennare, 2016 WL 1062819, at *10 (Pa. Super. Ct. Mar. 16,

2016) (nonprecedential).   The determination of the proper amount of a quantum meruit award is

left to the sound discretion of the trial court.   See Mager v. Bultena, 797 A.2d 948, 961 (Pa.

Super. Ct. 2002); Robbins v. Weinstein, 17 A.2d 629, 633 (Pa. Super. Ct. 1941).

The measure of damages in a quantum meruit action is "limited to the reasonable value of

the services performed."  Meyer, Darragh, 137 A.3d at 1251 n.6.

These principles are well-settled.   Perhaps somewhat less clear is the precise

methodology for measuring the reasonable value of the services performed by an attorney

retained on a contingency whose services are terminated prior to the occurrence of the

contingency.  See Mulholland v. Kerns, 822 F. Supp. 1161, 1169 (E.D. Pa. 1993) ("Pennsylvania

does not have a specific method for determining attorneys' fees quantum meruit").

A well-established methodology for determining the reasonable amount of an attorney's

fee is the lodestar approach: multiplying the reasonable number of hours expended by a

reasonable hourly rate.  See, e.g., Jones v. Muir, 515 A.2d 855, 864 (Pa. 1986); see also Lindy

Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161, 167–68

(3d Cir. 1973).

Pennsylvania courts have employed the lodestar approach as a means of measuring

quantum meruit attorney's fee awards.  See Mager, 797 A.2d at 956; Hiscott & Robinson v.

King, 626 A.2d 1235, 1237–38 (Pa. Super. Ct. 1993); Biersdorf & Assocs., P.C. v. Horner, 33

Pa. D. & C.5th 85, 93 (C.P. 2013).

A passage in Mager suggests that the lodestar approach is the sole method for

determining a quantum meruit attorney's fee award:

> While the termination of the contract by Mr. Bultena created an immediate right
> in ML&W to compensation for all work performed and costs incurred pursuant to
> that contract, that right included **only** quantum meruit compensation which is to
> be calculated based on the number of hours worked multiplied by a fair fee.

Mager, 797 A.2d at 957 (emphasis in original).

Other judicial opinions, however, suggest that a court may have more flexibility in

fashioning a quantum meruit attorney's fee award.

In Mager itself, the concurring opinion stated:

> Since a quantum meruit action sounds in equity, fairness should prevail. While the
> remedy in some cases may properly be determined by multiplying the hourly rate
> by the number of hours worked, other cases may warrant a more comprehensive,
> fact-specific approach.

Mager, 797 A.2d at 962 (Joyce, J., concurring).

Recently, a panel of the Pennsylvania Superior Court read the Mager majority opinion

narrowly and found the Mager concurrence persuasive.  In Angino & Rovner v. Jeffrey R. Lessin

& Assocs., 131 A.3d 502, 511 (Pa. Super. Ct. 2016), the court stated:

> However, an important aspect of Judge Joyce's concurrence in Mager is the idea
> that a quantum meruit recovery need not be limited to an hours and expenses
> analysis. . . . [Q]uantum meruit is an equitable action and principles of fairness
> should prevail. Depending on the nature of the case, merely multiplying the hourly
> rate by the number of hours worked may be too narrow of an approach.

This statement was not mere dictum.  The Angino & Rovner, court further held that

"[t]he facts of this case represent a compelling reason to award Angino more than an hours and

expenses quantum meruit recovery." Id..[16]

---

[16]   Other reported decisions in accord with Angino & Rovner include Paddick v. Butt, 2018
WL 1991737, at *15 (E.D. Pa. Apr. 27, 2018) (employing the lodestar "as a starting point," but
acknowledging that in some cases, it may be "too narrow of an approach") (citation omitted) and
Mulholland, 822 F. Supp. at 1169 (E.D. Pa. 1993) (a court "may calculate attorneys' fees quantum meruit
in whatever way seems most reasonable, given all the circumstances of the case before it," consistent
with In re Trust Estate of LaRocca, 246 A.2d 337 (Pa. 1968)).

The LaRocca court described the general methodology for determining reasonable
(continued...)

In the absence of controlling state court precedent, a federal court must try to predict how

the Pennsylvania Supreme Court would resolve an issue by examining the relevant decisional

law of both Pennsylvania intermediate courts and federal courts.  See, e.g., Klein v. Weidner, 729

F.3d 280, 283 (3d Cir. 2013) (citing Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.

15 (3d Cir. 1996)).

In my view, Angino & Rovner, the most recent intermediate Pennsylvania appellate

decision on the issue before this court, as well as the consistent federal court decisions from this

district, are the best barometers of Pennsylvania law on the subject.  Therefore, the foundation of

my quantum meruit analysis will be the lodestar approach, but that calculation will be subject to

modification based on other factual and equitable considerations that may be relevant.

## B.  Determination of the Recommended Quantum Meruit Award

### 1.

The first step in the two-step quantum meruit determination, the calculation of the

lodestar, is not difficult in this case.

Based upon the twenty-two (22) hours of time that Mirarchi expended in this matter

---

[16](...continued)
attorney's fees as follows:

> The facts and factors to be taken into consideration in determining the fee or
> compensation payable to an attorney include: the amount of work performed; the
> character of the services rendered; the difficulty of the problems involved; the
> importance of the litigation;  . . .   the degree of responsibility incurred; ... the
> professional skill and standing of the attorney in his profession; the results he
> was able to obtain; the ability of the client to pay a reasonable fee for the
> services rendered; and, very importantly, the amount of money . . .  in question.

246 A.2d at 339.

before his administrative suspension, (as he himself stated in documents filed with the court and

adopted, if somewhat grudgingly, in his testimony at trial) and his requested $300.00 hourly rate,

Mirarchi is presumptively entitled to a <u>quantum meruit</u> award of $6,600.00.

The second step in the determination  –  the factual and equitable adjustment of the

lodestar  –  has more moving parts.  As explained below, I recommend that the lodestar be

adjusted upward based on a qualitative evaluation of the value of the services that MLS provided

to the Thorpes.  However, I also recommend a second, downward adjustment of the award based

on other equitable considerations, specifically, Mirarchi's unprofessional conduct during the

relevant time period.

## 2.

In <u>LaRocca</u>, the Pennsylvania Supreme Court stated that among the factors to be

considered in determining the reasonable value of an attorney's services are the results the

attorney obtained and the amount of money in question.  246 A.2d at 339.

In this case, the Thorpes obtained a settlement of $324,729.30, a substantial sum.  The

question is: what was the value of MLS's services that contributed to this outcome?

Based on the facts presented here, the mechanical lodestar methodology (which would

yield an award of only $6,600.00) is too narrow an approach.  Rather, equity warrants the

consideration of more qualitative, holistic considerations in measuring the value of MLS's

services in the C.P. Action.

When the Thorpes retained MLS, their lawsuit against Nationwide was floundering.

Preliminary Objections to the complaint McDuffy filed on their behalf were pending and could

have resulted in the dismissal of their lawsuit.  McDuffy felt he lacked the expertise to overcome

this obstacle and to generally navigate the litigation to a successful conclusion. The Thorpes then

retained MLS. Working under some considerable time constraints, MLS responded to the

Preliminary Objections and prevented dismissal of the C.P. Action. Eventually, Mirarchi

persuaded Nationwide not to press its Preliminary Objections. Instead, Nationwide filed an

answer to the amended complaint that MLS filed on the Thorpes' behalf.[17]

When MLS took on the representation, the Thorpes were in a vulnerable position in the

C.P. Action. Its neutralization of Nationwide's dispositive motion, which permitted the litigation

to proceed to the discovery phase, was a significant contribution to the eventual successful

outcome of the litigation and should be considered in placing a value on MLS's services.

Of course, there is no objective formula for measuring value in the context presented

here. That said, I suggest that the following constitutes a fair valuation method in this case.

At the risk of oversimplification, litigation that does not settle can be categorized as

having three (3) phases: (1) pleadings; (2) discovery; and (3) trial. Throughout all three (3)

phases, representation may also involve settlement negotiations which may terminate the

litigation at any point.

Here, MLS made a substantial contribution in only one (1) of the three (3) litigation

phases, i.e., the pleading phase. MLS's contribution was limited to this one (1) phase of the

litigation. MLS did no discovery. And, as a matter of public policy, should MLS should not

---

[17]     I am aware that the Thorpes argue that the amended complaint was faulty and that they
suggest that its defects should cause the court to limit the quantum meruit award. However, in Thorpe I,
I was unpersuaded by the Thorpes' contention that the amended complaint was materially defective or
that MLS's representation in any other respect (up to the date of Mirarchi's administrative suspension)
was problematic. See 563 B.R. at 589 n.21 ("To the extent that the Thorpes contend that Mr. Mirarchi's
representation in general was sub-par, they did not prove this point at trial. Their evidence on the issue
was little more than a conclusory expression of lay opinion.").

receive any favorable consideration based on the settlement negotiations conducted while

Mirarchi was under administrative suspension and engaged in the unauthorized practice of law.

    While one may consider it a form of "rough justice" that may or may not be appropriate

in other factual settings, I consider it equitable in this setting to measure the value of MLS's

services as constituting one-third of what otherwise would have been the contractual

measurement of the value of the legal services.  In other words, on the particular facts presented

here, I propose that the district adopt the finding that, as an initial matter, the presumptive value

of the services provided is one-third (1/3) of the contractual contingent fee, i.e., one-third of

$113,400.00, or $37,800.00.[18]


### 3.

    There is an additional equitable consideration that must be evaluated in fashioning a

quantum meruit award that leads me to recommend a further adjustment – this time downward.

    MLS (acting through Mirarchi) acted inequitably in a variety of ways during the course of

its relationship with the Thorpes.  Mirarchi engaged in the unauthorized practice of law in

negotiating a settlement of the C.P. Action.  He failed to timely notify the Thorpes of his

administrative suspension, as required by Pennsylvania law.  He was uncooperative in his

responses to the Thorpes' request for specific details regarding the duration of the suspension.

And worse, in response to their inquiries, Mirarchi provided the Thorpes with information

---

[18]    Another way to conceptualize this valuation approach is as follows.  One-third of the negotiated contingent fee is the value I would place on MLS's services if: (1) there had been no professional misconduct; (2) the Thorpes had discharged MLS as their counsel on August 14, 2015 as a matter of right; and (3) replacement counsel, without doing discovery or engaging in extensive negotiations, had negotiated the same settlement that the Thorpes eventually obtained in the C.P. Action.

regarding the status of his professional license that was misleading, if not an outright

misrepresentation.  See Thorpe I, 563 B.R. at 604.

I am fully cognizant that the Court of Appeals panel held that Mirarchi's professional

misconduct was insufficient to preclude  MLS from obtaining a quantum meruit award. But I

read the panel's decision as holding only that, as a threshold matter, Mirarchi's misconduct was

insufficient to warrant a *complete forfeiture* of his equitable quantum meruit rights.  In its

decision, the panel evaluated Mirarchi's misconduct under an enhanced standard  – i.e., whether

his conduct "shock[ed] the conscience"[19]   The panel's employment of such a rigorous standard is

consistent with the equitable maxim that "equity abhors a forfeiture,"  See, e.g.., .Accurso v.

Infra-Red Servs., Inc., 169 F. Supp. 3d 612, 621 (E.D. Pa. 2016); In re Wolfe, 378 B.R. 96, 105

(Bankr. W.D. Pa. 2007).

But now we are beyond the threshold determination whether MLS may invoke equity and

the court's function is to do equity.  In making the equitable, quantum meruit determination

itself, Mirarchi' professional misconduct is a relevant consideration. Professional misconduct, by

its very nature detracts from the value of the services rendered by an attorney.  Furthermore, in

light of the overall equitable nature of the quantum meruit inquiry, consideration of an attorney's

professional misconduct is appropriate in the fulfilling the court's function of balancing the

competing interests of the parties and attempting to achieve an overall sense of fairness and

justice:

> [O]ne who seeks the aid of an equity court is subjected to the imposition of such
> terms as the settled principles of equity require. The court may impose any

---

[19]     Thorpe III, 755 F. App'x at 182.

> reasonable terms on plaintiff, as the price of the decree, in order to require that he
> or she do equity before having equity.

30A C.J.S. Equity §103 (West 2019) (footnotes omitted) (citing cases).

Thus, I conclude that it is permissible, appropriate and necessary for a court of equity to consider the professional misconduct of any attorney in determining the amount of a quantum meruit award.

This principle was applied in United States v. 36.06 Acres of Land, 70 F. Supp. 2d 1272 (D.N.M. 1999) to reduce a presumptive quantum meruit award due to attorney misconduct.  The court explained:

> In the present case, the firm's failure to observe the ethical requirement of
> reducing its fee agreement to writing renders its hands less than pristine for
> purposes of this motion. While it is not the province of this Court to sanction
> attorneys for breaching ethical rules, it is within the Court's discretion in an
> equitable proceeding such as this to vindicate the public policy evidenced by those
> rules. Accordingly, the Court holds that a reasonable fee under circumstances
> where the ethical rules have been breached by not putting the fee agreement in
> writing should be less than a reasonable fee in circumstances where no ethical
> breach has occurred.

Id. at 1277; accord Exact Software v. Infocon Sys., Inc.,  2011 WL 2490594, at *6-7 (N.D. Ohio June 22, 2011) (in quantum meruit action, a lawyer's unethical conduct "may reduce the value of such services").[20]

---

[20]      Further, the equitable maxim "equity will not suffer a wrong to be without a remedy" has some relevance here.  The Thorpes suffered a wrong through Mirarchi's professional misconduct.  They requested the total forfeiture of MLS's legal fee.  While they are not entitled to that relief, Thorpe III, there should be some remedy for the wrong committed by Mirarchi when he requests equitable relief from the court.

        Finally, I also am cognizant of the Court of Appeals' admonition that the Rules of Professional Conduct are not substantive law.  See Thorpe III, 755 F. App'x at 182.  Respectfully, I suggest that limiting to some degree the equitable relief afforded to an attorney invoking the equity jurisdiction of the court based on the attorney's professional misconduct is not applying the professional

(continued...)

In the circumstances presented here, I conclude that the appropriate equitable remedy is a reduction of the presumptive $37,800.00 <u>quantum meruit</u> award by one-third, <u>i.e.</u>, by $12,600.00 and I make that recommendation to the district court.

## IV.  CONCLUSION

For the reasons stated above, I recommend that the district court enter an order determining that the Escrowed Funds should be distributed as follows: $25,200.00 to MLS and $88,200.00 to the Thorpes.

**Date:  June 28, 2019**

_____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

[20](...continued)
rules as substantive law.  I perceive it as part of the process of considering all of the factual circumstances in the exercise of the equitable discretion accorded to a court of equity.